**EASTERN COAL CORPORATION v.
YOKE, Collector of Internal Revenue.**

No. 97–F.

District Court, N. D. West Virginia.

July 22, 1946.

D. H. Hill Arnold, of Elkins, W. Va., George Richardson, Jr., of Bluefield, W. Va., and Weil, Nesbit & Lisenby, Thorpe Nesbit, and S. Thomas Bucciarelli, all of Philadelphia, Pa., for plaintiff.

Joe V. Gibson, of Kingwood, W. Va., C. Brooks Deveny, of Fairmont, W. Va., and Rupert Bingham, of Washington, D. C., (Samuel O. Clark, Jr. and Andrew D. Sharpe, both of Washington, D. C., on the brief), for defendant.

HARRY E. WATKINS, District Judge.

In this action the taxpayer seeks to recover corporate income and excess profits taxes paid for the fiscal years ending April 30, 1937, to 1940, inclusive. Two questions are presented

1. Whether the plaintiff under certain written agreeements with Ford Motor Company in respect to the mining of coal from a certain coal tract, had such an economic interest in all of the coal in place as to be entitled under Section 114(b) (4) of the Revenue Acts of 1936 and 1938, 26 U.S. C.A. Int.Rev. Acts, pages 867, 1055, and of the Internal Revenue Code, 26 U.S.C.A. Int. Rev.Code, § 114(b) (4), to a deduction for depletion on a percentage of income basis on its total gross income (except for rents or royalties paid or incurred) derived from such mining.

2. If plaintiff does not have an economic interest in all of the coal in such tract, but has such economic interest in only an undivided one-eighth thereof, has plaintiff made such an election in its first return to deduct depletion on the percentage basis under Section 114(b) (4) of the Revenue Act of 1936, as to preclude it from taking depletion on the cost basis for subsequent years upon its one-eighth interest where the government has declined to allow plaintiff percentage depletion on the whole property as plaintiff elected? No such alternate claim is made for the year ending April 30, 1937.

Plaintiff contends: (1) That it has an economic interest in the entire tract and is entitled, in accordance with its election to percentage depletion on all of its gross income (except for rents or royalties paid or incurred) from mining operations; and (2) if plaintiff does not have an economic interest in all the coal in the tract, then plaintiff's purported election is of no effect because (a) an election made under a mistake of law is not binding, and (b) the commissioner is without authority to vary an election made by a taxpayer by accepting it in part only.

### Findings of Fact.

1. This action arises under the Internal Revenue laws of the United States and is

brought by Eastern Coal Corporation, hereinafter referred to as "Eastern", against F. Roy Yoke, individually and as Collector of Internal Revenue of the United States for the District of West Virginia, hereinafter referred to as the "Collector".

2. The taxpayer is a corporation organized under the laws of the State of West Virginia, with its principal place of business at 808 Perry Building, Bluefield, W. Va.

3. F. Roy Yoke is and on the various dates on which the taxes herein sought to be recovered was the duly appointed, qualified, and acting Collector of Internal Revenue of the United States for the District of West Virginia, having an office address at the Post Office and Court House Building, Parkersburg, W.Va.

4. All of the actions of the defendant, as hereinafter set forth, were done and performed in his official capacity as such Collector of Internal Revenue, and in accordance with instructions of his superior officers, and there was probable cause for all of his said actions. The defendant is entitled to a Certificate of Probable Cause so that any recovery herein will be paid by the United States of America.

5. During all times hereinafter mentioned Eastern was engaged in the business of mining coal, and all such mining was done on the Pond Creek Coal Tract.

6. Under date of June 1, 1936, Eastern entered into a certain agreement with Fordson Coal Company, hereinafter referred to as "Fordson", under which agreement, it leased from Fordson at a royalty rate of ten cents per ton, with minimum royalties the surface and mineral rights on a tract of coal land located in Pike County, Kentucky, known as the Pond Creek Coal Tract.

On the same date Eastern entered into two other certain agreements with Fordson under which, it purchased from Fordson for the sum of $1,235,000, payable $95,000 cash and the balance on a deferred-payment plan, the buildings, personal property and equipment located on the tract and used in connection with the mining operations. In each of the years involved in this action, Eastern was allowed in computing its taxable income depreciation according to law on the buildings, personal property and equipment it purchased from Fordson on June 1, 1936.

7. On June 1, 1936, Eastern entered into a certain agreement with Ford Motor Company, hereinafter referred to as "Ford", under which it agreed to sell Ford 6,500,000 tons of coal over a specified period at a base price of $1.56 per ton.

8. Eastern operated three mines on the leased premises and performed all of its obligations under the agreements and contracts until on or about March 24, 1937, when the aforesaid agreements were rescinded or terminated and the agreement of purchase between Eastern and Ford was with the consent of Eastern assigned or transferred by Fordson to Ford.

9. On or about March 24, 1937, Eastern entered into certain agreements with Ford under which, it

A. Became obligated to Ford for the unpaid balance of the purchase price of the buildings, personal property and equipment which it had purchased from Fordson.

B. Acquired an undivided one-eighth interest in the coal in place on the tract, being 10,000,000 tons out of the 80,000,000 recoverable tons estimated to be contained in the tract.

C. Agreed to mine, prepare and ship to Ford over a specified period 5,600,000 tons of coal at a base price of $1.46 per ton. It specified that the coal to be mined, prepared and shipped by Eastern, referred to in the agreement as "contractor" should be of certain prepared sizes and certain analysis and should be from the seven-eighths interest of Ford. It required Eastern to subordinate its own use and disposal of coal to the requirements of Ford, but specified that Eastern would not be required to mine, prepare and ship to Ford more than 130,000 tons of coal in any one month. The agreement contained the usual provisions with respect to cancellation for breach, and option of renewal after completion.

The agreement under which Eastern acquired the one-eighth interest recited that the parties had entered into a contract of even date under which Eastern had agreed to mine, prepare and ship to Ford from

the premises to the extent of Ford's requirements certain coal to be mined out of Ford's undivided interest retained in and to the coal underlying the tract, and that in consideration of $15,000 then paid and of further payments to be made and other valuable considerations and of the terms, covenants and conditions set forth Ford granted and sold to Eastern an undivided one-eighth interest in and to the coal in place, until Eastern should have mined and removed from the tract for its purposes, for sale or otherwise, a total of 10,000,000 tons within 15 years from the date of the agreement with reversion to the grantor at the end of the 15 years. The agreement granted to Eastern the right to mine coal from such tract and the usual rights to use so much of the surface as was necessary in conducting such mining operations; to cut and use so much of the timber on the tract as might be necessary for mining operations, and construction of buildings; and to use water originating or flowing over such land in connection with its mining operations. Other provisions, usual in mining leases provided for careful, efficient and workmanlike operations. Eastern was obligated to and did pay all taxes upon the entire tract of land, amounting to upwards of $35,000 per year. Eastern was required to make minimum annual payments in respect to the purchase price of its undivided one-eighth interest. The agreements provided that coal which, after being severed from the soil was allocated to fulfillment of Ford's requirements, should be deemed as partitioned and separated from the coal theretofore owned in common, and that coal so allocated to Eastern's purposes should be regarded as partitioned to plaintiff's interest theretofore owned in common. Eastern's right to partition to its own purposes any coal after being severed from the soil was subordinated to the requirements of Ford. It provided that if the contract for mining coal by Eastern for Ford should be terminated pursuant to certain provisions of the agreement, Eastern should upon demand of Ford surrender possession of the mines.

10. All parties to these agreements have at all times pertinent to this action performed their respective obligations under such agreements.

11. Eastern files its federal tax returns on a fiscal year basis ending April 30 of each year.

12. Eastern's books are kept and its federal tax returns are filed on the accrual accounting basis.

13. Eastern's first year of mining operations ended April 30, 1937.

14. On or about July 15, 1937, Eastern filed its corporation income and excess profits tax return for its fiscal year ending April 30, 1937, disclosing an income tax liability of $20,345.69 and an excess profits tax liability of $6,920.56, making a total tax liability of $27,266.25, which amount was assessed against and paid by Eastern.

15. Eastern in the return filed for its fiscal year ending April 30, 1937, which was its first return in respect of this mining property, elected "to have depletion computed on a percentage basis with respect to all mines, in accordance with Section 114 (b) (4) of the Revenue Act of 1936". The return showed a gross income from mineral extraction and processes in respect of the mining property of $2,082,184.96, exclusive of rents or royalties paid or incurred, and net income therefrom, computed without allowance for depletion of $160,059.34. In the return Eastern claimed a deduction for depletion of $80,029.67, or 5% of its gross income not in excess of 50% of its net income.

16. On audit of the return the Commissioner of Internal Revenue, hereinafter referred to as the "Commissioner", determined and assessed deficiencies in income and excess profits taxes against Eastern in the amounts of $7,407.89 and $3,372.00, aggregating $10,779.89, together with interest thereon of $2,008.45. Eastern was advised of such determination by letter dated June 4, 1940.

17. In determining the deficiencies set forth in paragraph 16 the Commissioner excluded any allowances for percentage depletion in respect to all of that portion of the coal mined by Eastern and shipped to Ford during the period from March 24, 1937, to April 30, 1937.

18. The deficiency assessed of $10,779.89 together with the interest thereon was paid by Eastern to the Collector on September 6, 1940.

19. On August 31, 1942, Eastern filed with the Commissioner a claim for refund of $4,000, "or more or less, with overpaid interest" on the ground that under the applicable sections of the Revenue Act of 1936, it was entitled to a depletion deduction of $92,253.41 instead of the depletion deduction allowed by the Commissioner of $83,680.82. The claim was rejected by the Commissioner, Eastern being advised of such rejection by registered letter dated July 31, 1943.

20. On or about July 15, 1938, Eastern filed its corporation income and excess profits tax return for its fiscal year ending April 30, 1938, disclosing a net income of $65,205.57, an income tax liability of $10,641.64 and an excess profits tax liability of $606.33, making a total tax liability of $11,247.97, which amount was assessed against and paid by Eastern. The return showed gross income from mineral extraction and processes in respect of the mining property of $2,529,055.62, exclusive of rents or royalties paid or incurred, but no net income therefrom, computed without allowance for depletion.

21. On audit of the return the Commissioner determined, after making certain adjustments, that Eastern's total net income was $100,342.09, and assessed deficiencies in income tax in the amount of $9,568.88 and in excess profits tax of $3,169.71, together with interest on said amounts in the sum of $1,609.07. In arriving at his determination the Commissioner excluded any allowance for depletion in respect to all of that portion of the coal mined and shipped to Ford by Eastern during the fiscal year. Eastern was advised of the Commissioner's determination by letter dated June 4, 1940. The deficiencies so assessed together with the interest thereon were paid by Eastern to the Collector on September 6, 1940.

22. On August 31, 1942, Eastern filed with the Commissioner a claim for refund of $5,000, "or more or less, with overpaid interest" on the ground that under the applicable sections of the Revenue Act of 1936 it was entitled to a depletion deduction, computed on a percentage of income basis, of $10,952.21, or in the alternative, on a cost basis, of $25,432.19. The claim for refund was rejected by the Commissioner and Eastern was so advised by registered letter dated July 31, 1943.

23. On July 15, 1939, Eastern filed its corporation income and excess profits tax return for its fiscal year ending April 30, 1939, disclosing net income of $83,328.40, income tax liability of $13,749.19, and no excess profits tax liability. The liability shown due was assessed against and paid by Eastern. The return showed gross income from mineral extraction and processes in respect of the mining property of $2,125,208.47, exclusive of rents or royalties paid or incurred, but no net income therefrom, computed without allowance for depletion.

24. On audit of the return the Commissioner determined, after making certain adjustments, that Eastern's total net income was $122,422.41 and assessed deficiency in income tax of $6,450.51, together with interest thereon of $651.41. The deficiency so assessed with interest thereon was paid on April 4, 1941, by Eastern to the Collector. In arriving at his determination the Commissioner excluded any allowance for depletion in respect to all of that portion of the coal mined and shipped to Ford by Eastern during the fiscal year. Eastern was advised of the Commissioner's determination by letter dated March 12, 1941.

25. On August 31, 1942, Eastern filed a claim for refund of $2,000 "or more or less, with overpaid interest" on the ground that under the applicable sections of the Internal Revenue Code, it was entitled to a depletion deduction computed, on a percentage of income basis of $13,264.87, or, in the alternative, on a cost basis, of $14,359.12. The claim for refund was rejected by the Commissioner, Eastern being advised by registered letter dated July 31, 1943.

26. On or about July 15, 1940, Eastern filed its corporation income and excess profits tax return for its fiscal year ending April 30, 1940, disclosing an income tax liability of $25,237.15 and no excess profits tax

liability. The liability shown on the return was assessed against and paid by Eastern. The return showed gross income of $2,710,012.40 from mineral extraction and processes in respect of the mining property, exclusive of rents or royalties paid or incurred, and net income therefrom, computed without allowance for depletion, of $82,572.03. In the return Eastern claimed a deduction on a percentage of income basis for depletion of $41,286.01.

27. On audit of the return the Commissioner determined, after making certain adjustments, that Eastern's net income from mineral extraction and processes in respect of said property, computed without allowance for depletion, was $89,062.67. The Commissioner determined a deficiency in income tax of $7,347.82 and a deficiency in excess profits tax of $2,292.90, which deficiencies he assessed against Eastern together with interest thereon of $395.14. The deficiencies with interest thereon were paid on April 4, 1941, by Eastern to the Collector. In arriving at his determination the Commissioner excluded any allowance for depletion in respect to that portion of all the coal mined and shipped to Ford by Eastern during the fiscal year. Eastern was advised of the Commissioner's determination by letter dated March 12, 1941.

28. On August 31, 1942, Eastern filed with the Commissioner a claim for refund of $10,000 "or more or less, with overpaid interest" on the ground that under the applicable sections of the Internal Revenue Code it was entitled to a depletion deduction on a percentage of income basis of $44,531.34, or, in the alternative, on a cost basis, of $16,658.78. The claim was rejected, Eastern being advised of such rejection by registered letter dated July 31, 1943.

29. The tonnage of coal mined by Eastern for its fiscal years ending April 30th follows:

| Year | Tonnage |
|---|---|
| 1937 | 1,346,874.15 |
| (March 21, 1937 to April 30, 1937) | 220,845.15 |
| 1938 | 1,536,139.55 |
| 1939 | 1,299,026.95 |
| 1940 | 1,659,400.20 |

Of the tonnage mined the following tonnage was prepared and shipped to Ford:

| Year | Tonnage |
|---|---|
| 1937 | 1,045,973.00 |
| (March 21, 1937 to April 30, 1937) | 162,673.75 |
| 1938 | 1,280,839.95 |
| 1939 | 1,155,856.70 |
| 1940 | 1,486,209.35 |

30. The plaintiff, during all times material hereto, paid the local taxes on the entire tract.

31. Under these agreements Eastern had substantially all the rights, duties, obligations and privileges of a lessee in respect of Ford's interest in the mineral in place.

32. Eastern's gross income from mineral extraction and processes included all amounts received by it for coal shipped to Ford. The base compensation of $1.46 per ton paid by Ford was a "sales price" received by Eastern from Ford's seven-eighths interest.

33. Eastern assumed that, under the law, it was entitled to percentage depletion in respect of all of the coal mined by it on the tract. Its election was to take a percentage depletion on all the coal mined. At no time did it elect to take a percentage depletion as to a part of the coal mined. The Commissioner declined to allow Eastern a percentage depletion on all the coal mined by it, in accordance with Eastern's election.

34. Eastern overpaid its taxes for its fiscal years ending April 30, 1937, 1938, 1939 and 1940, respectively, as follows:

| Year | Depletion Deduction | Tax Recoverable | Overpaid Interest |
|---|---|---|---|
| 1937 | $ 6,897.56 | $2,878.07 | $534.87 |
| 1938 | 9,518.51 | 4,354.48 | 549.98 |
| 1939 | 12,801.19 | 1,899.50 | 191.69 |
| 1940 | 44,117.50 | 8,954.39 | 367.20 |

(These amounts have been agreed upon by stipulation of the parties).

Conclusions of Law.

1. Eastern was in substance and effect a "lessee" of the seven-eighths interest of the coal tract which it did not own.

2. Eastern's "income from the property" within the meaning of Section 114(b) (4) of the Revenue Act of 1936

and 1938 and of the Internal Revenue Code included all its receipts from coal shipped to Ford.

■ 3. Eastern had such an economic interest in all the coal in place in the tract as to entitle it to a deduction for percentage depletion as defined in Section 114(b) (4) of the Revenue Acts of 1936 and 1938 and of the Internal Revenue Code.

■ 4. The Commissioner is without authority to vary the plaintiff's election to take depletion, by. allowing it in part and rejecting it in part.

■ 5. If Eastern is not entitled to percentage depletion on all the coal mined on the tract, then it is entitled to a deduction for depletion based on cost on all such coal. If Eastern does not have an economic interest in all the coal in place in the tract as to entitle it to percentage depletion, and such election as offered is rejected by the Commissioner, then there was no election to take depletion on a percentage basis and in the absence of such election, Eastern would be entitled to depletion upon a cost basis for years subsequent to April 30, 1937.

## Discussion.

The facts are revealed by copies of the various agreements admitted in evidence and by an agreed statement of facts.

■ There are different types of depletion deductions for taxpayers engaged in coal mining. Here we are concerned with only two, percentage depletion and cost depletion. Cost depletion is just what the name indicates, and is based upon the cost or March 1, 1913, value of the coal in place to the taxpayer. By allowing cost depletion an attempt is made to return to the taxpayer free of tax that portion of the cost attributable to the amount of mineral or other natural resource exhausted or used up in earning the income on which he is taxed during the particular taxable year. Martens, Law of Federal Income Taxation, Vol. 4, p. 207.

The right to a deduction on the percentage basis is granted a taxpayer by virtue of Sections 23(m) and 114(b) (4) of the Revenue Acts of 1936, and 1938, 26 U.S. C.A.Int.Rev.Acts, pages 829, 867, 1014, 1055, and the Internal Revenue Code, 26 U.S.C.A.Int.Rev.Code, §§ 23(m), 114(b) (4). Percentage depletion was first included in the Revenue Act of 1926. It is based upon gross income from the property, rather than cost or the value or size of the taxpayer's interest in the property. In the case of coal mining, it is an arbitrary allowance of 5% of the amount for which the taxpayer sells (with limitations) the coal, not exceeding 50% of the net income of taxpayer (computed without allowance for depletion) from the property. The administrative difficulties in taxation of production of such natural resources in view of the uncertainties of quantities and time of acquisition, that is at the purchase of the property, or at the discovery of the coal, oil or gas, have brought about this method of figuring depletion. Kirby Petroleum Co. v. Commissioner of Internal Revenue, 66 S.Ct. 409.

■ It is permitted in recognition of the fact that coal is a wasting asset and is intended as compensation to the person with an economic interest in the deposit for the part used up in production. The depletion is allowed on "the gross income from the property". The Supreme Court has said with respect to oil wells, that it is enough if one "has an economic interest in the oil, in place, which is depleted by production"; that "the language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." Palmer v. Bender, 287 U.S. 551, 557, 53 S.Ct. 225, 227, 77 L.Ed. 489. The phrase economic interest is not to be taken as embracing a mere economic advantage derived from production, through a contractual relation to the owner by one who has no capital investment in the mineral deposit. Helvering v. Bankline Oil Co., 303 U.S. 362, 367, 58 S.Ct. 616, 82 L.Ed. 897. Only a taxpayer with an economic interest in the asset, here the coal, is entitled to percentage depletion. "Economic interest does not mean title to the oil in place but the possibility of profit from that economic in-

terest dependent solely upon the extraction and sale of the oil." Kirby Petroleum Co. v. Commissioner, supra. And it makes no difference whether the return is in the form of mineral in kind or cash proceeds from the sale thereof. In either event the lessee's possibility of return depends upon coal extraction and ends with the exhaustion of the supply.

The only issue in this case so far as the percentage depletion is concerned is whether Eastern had an economic interest in the coal. During that part of Eastern's fiscal year ending April 30, 1937, which elapsed prior to March 24, 1937, being the first fiscal year involved in these proceedings, Eastern operated under a set of agreements which included a lease from Fordson, the then owner of the property. Under those agreements Eastern was paid a base price of $1.56 per ton by Ford, but was required to pay a royalty of 10 cents per ton to Fordson, so that the net proceeds to Eastern for each ton of coal mined and shipped to the Ford interests amounted to $1.46.

The Commissioner concedes that under such lease which existed prior to March 24, 1937, that Eastern, the lessee, had an economic interest in all the coal in place and was entitled to percentage depletion on all the coal mined. After March 24, 1937, the Commissioner concedes that Eastern had an economic interest in the undivided one-eighth of the coal owned by it, and was entitled to percentage depletion thereon, but contends that Eastern had no economic interest in the undivided seven-eighths interest owned by Ford, and therefore, is not entitled to percentage depletion on any of the coal mined for Ford.

If the Commissioner is correct, it means that Eastern will receive no depletion of any. kind upon the coal mined for Ford. As to the coal mined from its own one-eighth interest which has been definitely wasted away, Eastern would be required to figure its depletion upon the percentage basis, instead of on the cost basis, because the Commissioner contends that Eastern elected the percentage basis as to the whole property in its first return. The Commissioner admits that Eastern's election for percentage depletion as to the whole of its mining operations was rejected, but contends that such election is yet binding as to a part of such mining operations. Percentage depletion as to coal mined from this one-eighth interest will not help Eastern because there was practically no net income from these operations and if there is no net income there can be no allowance for percentage depletion. The result of all this is that Eastern will receive practically no deduction for depletion on any basis. Instead of receiving depletion deduction by one or another of two methods, whichever Eastern preferred, such as to result in the smaller tax, as contemplated by the statute, it will receive neither. It is stipulated by the parties that if Eastern is entitled to deduct depletion on the percentage of income basis, it has overpaid its taxes for the years 1937 to 1940, inclusive, in the amount of $18,086.44 plus overpaid interest of $1,643.74, a total of $19,730.18, and that if it is entitled to deduct depletion on the cost basis for the years subsequent to April 30, 1937, it has overpaid its tax in the amount of $15,420.65 plus interest of $1,-619.71, a total of $17,040.36. Equity would seem to allow the taxpayer one or the other under a statute which expressly gives the taxpayer his election.

In its first return Eastern elected to take depletion as to the whole of its operations on the percentage basis, and while the question is one not free from difficulty, I think it was entitled to such percentage depletion on its entire operations.

■ Since the Commissioner concedes that Eastern had an economic interest and was entitled to percentage depletion on all coal mined prior to March 24, 1937, we should first inquire as to what changes were made in the new agreements. The changes brought about by the agreements of March 24 changed the prior existing relationship of Eastern to Ford's undivided seven-eighths interest in form only. Instead of paying the Ford interests a royalty of 10 cents per ton on all the coal mined, and receiving from the Ford interests $1.56 per ton, Eastern paid no royalty, but received from the Ford interests a payment of $1.46 per ton. The

net proceeds derived from each ton of coal shipped to Ford was exactly the same as before. Eastern was admittedly a lessee and producer of the coal for profit under the original lease. Unquestionably the sum of $1.46 was sufficient, in Eastern's opinion, to allow it a fair profit on the sale of each ton of coal. Obviously such element of sales profit was saved to Eastern under the new arrangement because the net proceeds of $1.46 per ton were retained. This right to be paid by Ford $1.46 for every ton of coal produced from this property represented a share of the product produced, and assurance of a share upon production marks ownership of an economic interest in the mineral in place. See Chief Counsel Memorandum No. 22730, reported in Cumulative Bulletin Bureau of Internal Revenue 1941, page 10. As was said in Kirby Petroleum Co. v. Commissioner, supra, the possibility of return depends upon extraction of the mineral, and ends with the exhaustion of the supply. The Commissioner's contention that after March 24, Eastern was a mere hireling, and that the $1.46 it received covered only services rendered or supplies furnished is without foundation of fact. There are many other similarities resembling a lessor-lessee arrangement common to the new and old agreements. Eastern was obligated to pay all taxes assessed on the land and property, including the seven-eighths interest owned by Ford, amounting in all to upwards of $35,000 per year, under both sets of agreements. Under both sets of agreements Ford was given a prior call up to certain stated maximums on all coal produced from the entire tract. Payments for coal were to fluctuate under both sets of agreements in accordance with certain prescribed formulae relating primarily to labor costs. Under both the old and new agreements the buildings, personal property and mining equipment were owned by Eastern, a rather unusual burden upon one who was a mere hireling. Eastern was granted the right for a long term to conduct mining operations on the whole tract in both sets of agreements. The usual rights appearing in coal mining leases to (a) cut and use timber necessary for mining operations, (b) right to use water on the premises, (c) right to construct, maintain and use roads, waterways, electric lines, etc., and (d) right to enter upon and use the surface of such tracts were all incorporated into the new agreements in almost identical language used in the original leases. The language used in the new agreements seems to follow generally the language used in the old agreements, except that the word "grantor" is substituted for "lessor" and "grantee" for "lessee", and Eastern is described as the "contractor". A comparison of the two sets of agreements shows that Eastern as "contractor" or "grantee" had substantially the same duties and was required to operate the mining property in substantially the same manner as when it was designated as "lessee". It is fundamental in tax law that the courts look through form to fact and substance. Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755; Lehman et al. v. Commissioner, 2 Cir., 109 F.2d 99. In substance Eastern continued as a lessee and as such was entitled to percentage depletion.

The last case before the Supreme Court involving percentage depletion was Burton-Sutton Oil Co. v. Commissioner, 66 S. Ct. 861, 866, wherein the court said:

"It seems generally accepted that it is the owner of a capital investment or economic interest in the oil in place who is entitled to the depletion. Anderson v. Helvering, 310 U.S. 404, 407, 60 S.Ct. 952, 953, 84 L.Ed. 1277; Euleon Jock Gracey, 5 T.C. 296, 302; Kirby Petroleum Co. v. Commissioner, supra. Whether the instrument creating the rights is a lease, a sublease or an assignment has not been deemed significant from the federal tax viewpoint in determining whether or not the taxpayer had an economic interest in the oil in place. Palmer v. Bender, 287 U.S. 551, 557, 558, 53 S.Ct. 225, 227, 77 L. Ed. 489. * * * It is not material whether the payment to the assignor is in oil or in cash which is the proceeds of the oil, Helvering v. Twin Bell [Oil] Syndicate, 293 U.S. 312, 321, 55 S.Ct. 174, 178, 79 L.Ed. 383, nor that some of the payments were in the form of a bonus for the contract.

Burnet v. Harmel, 287 U.S. 103, 111, 53 S.Ct. 74, 77, 77 L.Ed. 199; Murphy Oil Co. v. Burnet, 287 U.S. 299, 302, 53 S.Ct. 161, 162, 77 L.Ed. 318 * * * Leases are a method of exploitation of the land for oil and payments under leases are 'income to the lessor, like payments of rent.' * * *

"In the present case, the assignor of the petitioner before assignment had an economic interest in the oil in place through its control over extraction. * * * The cost of that investment to the beneficiary of the depletion under Section 114(b) (3) is unimportant. Depletion depends only upon production. It is the lessor's, lessee's or transferee's 'possibility of profit' from the use of his rights over production, 'dependent solely upon the extraction and sale of the oil' which marks an economic interest in the oil. See Kirby Petroleum Co. v. Commissioner, supra * * *. Through retention of certain rights to payments from oil or its proceeds in himself, each of these assignors of partial exploitation rights in oil lands has maintained a capital investment or economic interest in the oil or its proceeds. As the oil is extracted and sold that economic interest in the oil in place is reduced and the holder or owner of the interest is entitled to his equitable proportion of the depletion as rent or royalty. The operator, of course, may deduct such payments from the gross receipts."

Here Eastern had an economic interest in the coal in place through its control over extraction. The cost of that investment, or economic interest to Eastern is immaterial. Eastern's possibility of profit from the use of its right over production, dependent solely upon extraction of coal, marks its economic interest in the coal in place.

■ A review of authorities indicates that if the operator of coal mines or the driller of an oil well makes an investment by which he acquires an economic interest in the coal or oil in place, expenditures made by him represent capital expenditures returnable tax-free through the depletion allowance rather than by way of expense deduction, and the coal or oil payment rights acquired do not represent payment in property for services rendered or supplies furnished. Irrespective of conveyancing formalities, one who has a right to share in the coal produced also has a corresponding interest in the coal in place. The courts have repeatedly held that rights to share in the gross proceeds derived from the sale of the mineral produced are analogous to rights to share in the mineral produced. It follows that one who has a right to a share of the proceeds from the sale of coal produced has ownership of a corresponding depletable economic interest without regard to conveyancing formalities. See opinion of Chief Counsel Bureau of Internal Revenue, supra, wherein it is stated: "It thus appears that the controlling cases regard capitalized development costs as representing investments returnable through the depletion allowances, whether the total development investment is made by a landowner who elects to develop the property himself and take all the oil or mineral or is shared by a number of investors who, by contractual arrangements, between themselves, agree to divide the resulting oil or mineral product or the proceeds from the sale of such product. If the latter, the division of oil, or the gross income therefrom, determines the economic ownership of oil or mineral in place as well as the gross income and attending depletion allowance. Under this test, the form of the contracts dividing the product or the gross income therefrom, or the legal phraseology or devices utilized to accomplish the division, are immaterial."

■ It is significant that under the new as well as the old agreements Eastern was obligated to pay the local taxes on all the coal property, including the seven-eighths interest owned by Ford. Under the income tax laws when the occupant of premises pays the owner's real estate taxes, the owner is held to be receiving rent to the amount of the taxes paid. Article 23(a)–10 of Treasury Department Regulations 94, promulgated under the Revenue Act of 1936 reads in part as follows: "Taxes paid by a tenant to or for a landlord for business property are additional rent and constitute a deductible item to the tenant and taxable income to the landlord, the amount of the tax being deductible by the latter."

176

Eastern asserts that this payment of rent, coupled with occupancy of necessity establishes the existence of a lease and that, wholly aside from the parallelling features of the old and new agreements, Eastern should by reason of these payments be viewed as a lessee of Ford's undivided seven-eighths interest and as such possessed of the requisite economic interest to be entitled to percentage depletion.

The Commissioner claims that under the new agreements executed March 24, 1937, Eastern had no economic interest in the undivided seven-eighths interest of the coal tract. This same contention was unsuccessfully asserted before the Board of Tax Appeals in North Range Mining Co. v. Commissioner, Feb. 11, 1942, 46 B.T.A. 296. The facts are very similar to the facts here under consideration.

Ford Motor Co. was the sublessee of certain iron ore properties in Michigan, and entered into certain mining agreements with North Range Mining Co., referred to in the agreements as "operator", wherein North Range agreed to mine and load ore for shipment to Ford for a period of five years, for which Ford was to pay $1.25 per gross ton. As here, provision was made for the fluctuation of price to reflect changes in labor costs. Any ore produced in excess of Ford's requirements could be sold by the operator on the open market, and for such excess ore sold Ford was to receive a royalty ranging from seventy-five cents to one dollar per gross ton. The operator was to pay Ford certain sums as advance royalties, as well as regular quarterly royalty payments. However, the operator had a right to apply a credit of fifty cents per gross ton of ore sold to others against these advance royalties. If this was not sufficient to absorb the advance royalties, then it was entitled to a similar credit on ore sold to Ford. The mining property was turned over to the operator fully equipped for operation. The operator was to pay all taxes and assessments on the lands and the ore mined therefrom during the period of the contract. No fee ownership of any of the ore in place was granted to the operator and the contract did not purport to grant a leasehold interest as such in the ore. Nevertheless, the Board of Tax Appeals held

that North Range had an economic interest in the ore in place and allowed it to deduct percentage depletion with respect to ore shipped to Ford as well as to ore shipped to others. The Board said:

"The parties submit that the question in issue hinges upon the construction of the agreement of November 1, 1933, and particularly that portion of the agreement relating to the iron ore to be mined and sold to Ford. The respondent contends that under the contract in question petitioner's relationship to Ford at least as to the ore to be sold to Ford, was that of an independent contractor and not a lessee, and that petitioner operated the mine merely as an agent of Ford, with the right to dispose of any excess ore over Ford's needs on its own behalf. The parties devote a considerable portion of their briefs to a discussion of whether petitioner, under the agreement of November 1, 1933, was a lessee, or a mere assignee, or an independent contractor. As to the construction of the agreement it is not material to our purpose whether it is a sublease or some other form of contract. Whatever the form technically, if it conveyed the petitioner an interest in the ore in place, depletion deductions on such ore are allowable to petitioner. Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199; Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489; Willis R. Dearing, 36 B.T.A. 843; T. W. Lee, 42 B.T.A. 1217. With respect to the application of the decision of the Supreme Court in Palmer v. Bender, supra, G.C.M. 11822, Cumulative Bulletin XII-1, p. 229, provides in part as follows: 'Accordingly the right to a depletion allowance does not depend upon the nature or character of the legal estate retained or acquired by the parties to an original oil and gas lease or their successors, but depends entirely upon whether any of such parties is entitled to share in the oil and gas produced from the properties. If any of such parties is entitled to a share of the oil and gas, he has the "economic interest" upon which the Supreme Court bases the right to a depletion allowance * * *.' We see no justification for treating the agreement of November 1, 1933, as divisible and as requiring the ore sold to Ford to be treated in a different manner for depletion pur-

poses from that sold to others. While this ore was sold to Ford at a price under market, the practical result, as petitioner suggests in its brief, was the same as if the ore had been sold to Ford at market and petitioner had paid royalties to Ford approximating the difference between the market price and the contract price. In that case Ford would have been entitled to depletion deductions on the royalty interests which it retained and petitioner would have been entitled to depletion deductions on the amounts received from Ford."

Another case similar to the one under consideration is Spalding v. United States, 9 Cir., 97 F.2d 697, 700, certiorari denied, 305 U.S. 571, and 644, 59 S.Ct. 229, 83 L.Ed. 360, wherein the court held an oil company to have an economic interest in the oil and gas in place similar to that of a lessee and said: "Though referred to in the agreement as a 'contractor,' the Oil Company was not, as contended by appellant, a mere contractor for hire."

In my opinion Eastern was the actual producer of the coal. Gray et al. v. Powell et al., 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301. Counsel have not cited and I have not found a single case among the many cases involving percentage depletion where the actual producer has been denied percentage depletion with respect to his interest in the proceeds of the mineral produced. There are many cases where the courts have denied percentage depletion where the taxpayer was a mere processor of the mineral after extraction.

I find no merit in Commissioner's contention that Eastern has failed to carry the burden of proof required. The sales price of $1.46 per ton has been allocated to Eastern as its interest in the gross proceeds of production from the seven-eighths interest and constitutes its income from such property. Ford's gross income from the property was the amount by which the representative market or field price of the coal before transportation from the immediate vicinity of the mine exceeded the $1.46 per ton which Ford and Eastern have agreed upon as being Eastern's interest in the coal.

Since the first question has been decided in favor of Eastern, it is not necessary to decide the second question. However, in order to expedite this litigation I have fully considered the second question also, and am of the opinion that should Eastern be denied percentage depletion on the whole property, it should be allowed depletion on the cost basis. It is entitled to one or the other. The Commissioner must either accept Eastern's election as made or reject it. If Eastern is denied percentage depletion on the percentage basis on the whole property, then it is in the position of having made no election at all and is automatically entitled to cost depletion. This is not a case where Eastern has made a valid election and then belatedly attempted to change such election as made. Consequently the cases cited by defendant relating to changes in election are not in point. Eastern does not want to change its election as made, but if such election is rejected as made, then it says that it has made no election and under the statute is automatically entitled to depletion on the cost basis.

The first question is answered in the affirmative, and the second question is answered in the negative. An order may be entered in accordance with the views herein expressed.