Emil USIBELLI and Rose P. Usibelli, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 14559.

United States Court of Appeals Ninth Circuit.

Dec. 14, 1955.

A. R. Kehoe, Jones & Grey, Seattle, Wash., for appellant.

H. Brian Holland, Asst. Atty. Gen., I. Henry Kutz, Ellis N Slack, Lee A. Jackson, Robert B. Ross, Special Assts. to Atty. Gen., for appellee.

Richard L. Levy, William T. Coleman, Jr., Dillworth, Paxson, Kalish & Green, Philadelphia, Pa., Edgar J. Goodrich, Lipman Redman, Guggenheimer, Untermeyer, Goodrich & Amram, Washington, D. C., John W. Bodine, Philadelphia, Pa., counsel for Jeddo-Highland Coal Co., and the Anthracite Institute, Drinker, Biddle & Reath, Philadelphia, Pa., of counsel, amici curiae.

Before STEPHENS, HEALY, and POPE, Circuit Judges.

STEPHENS, Circuit Judge.

This case is before us on petition for review of a decision of the Tax Court of the United States and involves a claimed allowance of a depletion deduction under Section 23(m) [1] of the Internal Revenue Act of 1939 to petitioner for certain government coal lands which he strip-mined pursuant to a contract with the United States Army. Except where otherwise stated in this opinion, the term "petitioner" refers to petitioner Emil Usibelli.

On April 5, 1946, special permission was granted by the Secretary of the Interior to the United States Army to mine coal from specified government land in Alaska. Unless otherwise terminated, the permit would expire six months after the cessation of hostilities in World War II as determined by Presidential proclamation or concurrent Congressional resolution. Under the terms of this permit the actual mining could be done either by the Army or by private parties under contract with the Army.

On July 1, 1946, the Army entered into a one-year contract with petitioner (Emil Usibelli) to strip-mine coal on the specified government lands at Suntrana, Alaska, for supplying coal to the Army at Ladd Field, Alaska. The coal was to consist of 40,000 tons of mine run and 30,000 tons of lump nut to be placed on railroad cars at the mine, graded and screened. If the contract remained in effect throughout its term, petitioner was to be paid a total amount of $362,500, computed at $4.75 per ton of mine run, and $5.75 per ton of lump nut.[2] A minimum of 5,600 tons was to be delivered each month but the government could reduce the specified quantities to be delivered in the event its requirements should change, and the contract could be terminated in whole or from time to time in part whenever the contracting officer should determine such action to be in the best interest of the government.[3]

Petitioner bid on and obtained a similar contract for the fiscal year 1948 under which he was to be paid $577,000, computed at $5.22 per ton of mine run and $6.22 per ton for lump nut and stoker coal. Petitioner conducted mining operations under the contracts during the taxable years 1947 and 1948.

In 1947 he filed a separate return with the Collector of Internal Revenue for the District of Washington in which he claimed a depletion deduction from his gross income of $1,476.69.

In 1948 petitioners, Emil Usibelli, and his wife, Rose Usibelli, filed a joint return in which they claimed a depletion deduction of $5,648.24. The Commissioner denied both deductions on the ground that petitioner had no such interest in the coal in place which he was mining for the Army as would entitle

---

1. Title 26 U.S.C.A. § 23(m); see note 4 infra.

2. Subsequent modification provided that all coal delivered should be mine run.

3. The contract also provided how settlement would be made in the event of termination.

him to a deduction for its depletion. The Tax Court upheld the Commissioner, and the taxpayers petition this court for a review of that decision.

At the outset it is well to have in mind that there is no contention that the coal in place would, or might, be depleted below the amount of coal to be extracted even if the contract should be allowed to remain in force until the total contractual tonnage had been extracted.

Section 23(m) of the Internal Revenue Act of 1939 [4] provides in part:

"Deductions from gross income. In computing net income there shall be allowed as deductions

\* \* \* \* \*

"(m) Depletion. In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case \* \* \*."

The amount of the depletion allowance for coal mines is contained in Section 114,[5] viz:

" \* \* \* (A) In general. The allowance for depletion under section 23(m) shall be, in the case of coal mines, 5 per centum \* \* \* of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. \* \* \* "

These sections constitute recognition by Congress that extractive industries, unlike the manufacturing industries, look to their profits from the sale of a portion of their capital assets with the result that each sale results in a corresponding depletion in the remaining capital assets. The depletion deduction allowed by these sections is *not* to be construed, as petitioner contends, as a reward to those persons who actually mine the coal for the risks inherent in extraction. In common with industry generally those engaged in extraction of minerals on a for-hire basis receive their tax benefit through depreciation and obsolescence allowances,[6] and not through an allowance for the depletion of the mineral deposit on which they happen to be working.

In order that persons investing in mineral deposits could fairly recover their investment, Congress originally provided that the cost of the asset (in the instant case, the coal in place) be recovered over the expected life of the mine, and where the mine had been acquired prior to 1913, allowed the value as of March 1, 1913, to be so recovered. During the first World War the need for increased exploitation of natural resources resulted in the allowance by the Revenue Act of 1918, 40 Stat. 1057, of the value of the deposit "at the date of the discovery". Discovery depletion served the purpose of allowing the discoverer of a new mineral deposit to recover not only his actual costs but also the much larger appreciated value of the property at the time its profitability was established.[7] The practical difficulty inherent in the administration of each of these methods for depletion allowance is that of fairly determining the value of the mineral deposit when such determination rests upon factors extremely difficult of accurate ascertainment such as the size and quality of the deposit, the market conditions relative to the sale of the product, and the fair rate of return to be allowed on the capital investment. Since without extraction there is no depletion, the ideal solution to the problem was to devise a method whereby depletion would depend directly upon actual production. This was ultimately accomplished as in the present

4. Title 26 U.S.C.A. § 23, 53 Stat. 12, amended June 29, 1939, 10 p. m., E.S.T., c. 247, Title II, § 211(a) as amended.

5. Title 26 U.S.C.A. § 114, 53 Stat. 45, as amended.

6. Title 26 U.S.C.A. § 23(*l*), 53 Stat. 12, as amended.

7. See the statements of Secretary of the Treasury Snyder at the Hearings of the Ways and Means Committee, on the Revenue Revision of 1950, at p. 51.

Act[8] by determining the average percentage of the gross income from each mineral which was actually being allowed under the former methods, and allowing that average of the gross income from extraction as a depletion deduction from the gross income of entitled persons. In the case of coal, the applicable deduction under the statute here in force was set at 5%[9] of the gross income attributable to the extraction of the coal. Although providing a more workable method of administration, the granting of an arbitrary deduction of a percentage of gross income in no way altered the basic theory that the deduction be allowed to the owner of wasting assets as compensation for that part of his assets which are used up in production.[10]

This theory is fundamental in determining those entitled to the deduction, since basically a taxpayer must possess a sufficient economic interest in the mineral being produced in order to avail himself of the deduction. This principle was succinctly stated by the Supreme Court in Kirby Petroleum Co. v. Commissioner, 1946, 326 U.S. 599, 603, 66 S.Ct. 409, 411, 90 L.Ed. 343:

"* * * [O]nly a taxpayer with an economic interest in the asset, here the oil, is entitled to the depletion. Palmer v. Bender, 287 U.S. 551, 557, 53 S.Ct. 225, 226, 77 L.Ed. 489; Thomas v. Perkins, 301 U.S. 655, [659], 57 S.Ct. 911, 913, 81 L. Ed. 1324. By this is meant only that under his contract he must look to the oil in place as the source of the return of his capital investment. * * * The test of the right to depletion is whether the taxpayer has a capital investment in the oil in place which is necessarily reduced as the oil is extracted. See Anderson v. Helvering, 310 U.S. 404, 407, 60 S. Ct. 952, 954, 84 L.Ed. 1277."[11]

Because of the high cost of exploiting and developing mineral deposits on a commercial basis, the practice in the extractive industry is for owners of mineral bearing lands to lease or grant mineral rights in their lands to professional exploiters who may operate the lease themselves or may sublease or grant mineral rights in their lands to professional exploiters who may operate the lease themselves or may sublease or assign it to others for actual production. The ultimate operator therefore is often connected with the owner only by a chain of predecessors in interest, each of whom may retain some interest in the mineral through over-riding royalties or participating interests.[12] On the other hand, the owner or one of his successors

8. Title 26 U.S.C.A. § 114, note 4, supra.

9. Since increased to 10% as amended Aug. 8, 1947, c. 515, § 15(b, c), 61 Stat. 920; Sept. 23, 1950, 3:15 p. m. E.D.T., c. 994, Title II, § 207(a), 64 Stat. 931; Jan. 3, 1951, 10:13 a. m., c. 1199, Title III, § 304(d), 64 Stat. 1220; Oct. 20, 1951, 2:07 p. m. E.S.T., c. 521, Title III, § 319 (a) (b), 65 Stat. 497.

10. Kirby Petroleum Co. v. Commissioner, 1946, 326 U.S. 599, 602, 66 S.Ct. 409, 90 L.Ed. 343; Helvering v. Bankline Oil Co., 1938, 303 U.S. 362, 366, 58 S.Ct. 616, 82 L.Ed. 897; United States v. Ludey, 1927, 274 U.S. 295, 47 S.Ct. 608, 71 L.Ed. 1054; United States v. Dakota-Montana Oil Co., 1933, 288 U.S. 459, 467, 53 S.Ct. 435, 77 L.Ed. 893; Commissioner of Internal Revenue v. Southwest Exploration Co., 9 Cir., 1955, 220 F.2d 58, certiorari granted 350 U.S. 818, 76 S.Ct. 83.

11. See also Burton-Sutton Oil Co. v. Commissioner, 1946, 328 U.S. 25, 32 et seq., 66 S.Ct. 861, 90 L.Ed. 1062; Palmer v. Bender, 1933, 287 U.S. 551, 557, 53 S.Ct. 225, 77 L.Ed. 489; Commissioner v. Southwest Exploration Co., 9 Cir., 1955, 220 F.2d 58, 60 et seq.

12. As an example in Burton-Sutton Oil Co. v. Commissioner, 1946, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062, the Cameron Parish School Board as owner of certain oil bearing land leased it to one Sweeny retaining an underlying royalty. Sweeny in turn conveyed certain rights in the land to the Gulf Refining Company reserving an overriding royalty to himself. Gulf contracted with one Sutton to operate the lease and pay Gulf approximately 50% of the net. Finally, Sutton assigned his rights in the land without reservation to the taxpayer in the case, the Burton-Sutton Oil Co.

in interest may conduct the operation himself by employing a contractor to carry on the actual extractive operations. Attempts by the courts to identify the interests of the parties to these varied relationships have given rise to the tenuous distinctions with which the tax aspect of this field is fraught. Mr. Justice Frankfurter voiced this in his dissenting opinion in Burton-Sutton Oil Co. v. Commissioner, supra [328 U.S. 25, 66 S.Ct. 868], viz:

"Nothing better illustrates the gossamer lines that have been drawn by this Court in tax cases than the distinction made in the Court's opinion between Helvering v. Elbe Oil Land Co., 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904, and this case. To draw such distinctions, which hardly can be held in the mind longer than it takes to state them, does not achieve the attainable certainty that is such a desideratum in tax matters * * *."

Obviously then not every person engaged in the extraction of a mineral can claim a depletable interest. For instance, mining as defined in the statutes applicable herein [13] includes not merely the extraction of the coal from the ground but in addition its cleaning, breaking, sizing and loading for shipment which are processes normally performed by mine owners or operators in order to obtain the commercially marketable product. Subsequent amendments [14] additionally included so much of the transportation of the ore (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied, as is not in excess of 50 miles, and even then if necessary transportation for a greater distance might be included.

Certainly, the individual miners cannot be said to possess a depletable interest in the mineral even though their jobs depend upon its continued availability. Nor can the railroad transporting the coal to the breaker, or the contractor operating the breaker, claim a sufficient economic interest to warrant a depletion deduction even though exhaustion of the mineral deposit would drastically curtail their revenue. Such persons may be said to derive an economic advantage from the continued extraction of the coal,

"But the phrase 'economic interest' is not to be taken as embracing a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit." [15]

The question of whether any given taxpayer engaged in the extractive industries has, under the facts of his particular case, a depletable interest in the mineral in place, is difficult and depends for its answer upon the varied incidents of the contractual relation under which he works. In making this determination, various tests have been applied by the courts and by the department.[16]

13. Title 26 U.S.C.A. § 114(b) (4) (B), Oct. 21, 1942, 4:30 p. m., EWT, c. 619, Title I, § 145, 56 Stat. 840; Feb. 25, 1944, 12:49 p. m. E.W.T., c. 63, Title I, § 124(a–c), 58 Stat. 44, 45.

14. Title 26 U.S.C.A. § 114(b) (4) (B) as amended Aug. 8, 1947, c. 515, § 15(b, c), 61 Stat. 920; Sept. 23, 1950, 3:15 p. m. E.D.T., c. 994, Title II, § 207(a), 64 Stat. 931; Jan. 3, 1951, 10:13 a. m., c. 1199, Title III, § 304(d), 64 Stat. 1220; Oct. 20, 1951, 2:07 p. m., E.S.T., c. 521, Title III, § 319(a) (b), 65 Stat. 497.

15. Helvering v. Bankline Oil Co., 1938, 303 U.S. 362, 367, 58 S.Ct. 616, 82 L.Ed. 897; Helvering v. O'Donnell, 1938, 303 U.S. 370, 372, 58 S.Ct. 619, 82 L.Ed. 903.

16. This entire question is well covered by the ruling of the General Counsel's office issued in 1950 as G.C.M. 26290 C.B. 1950–1, p. 42, and quoted in part below, viz.:

"For the purpose of facilitating consideration of the question here involved, a number of the stripping contracts which it is understood are typical of those used in the coal industry have been examined. For convenience, the parties to such contracts will be hereinafter referred to as the coal company and the contractor respectively. In view of the contents of the contracts examined, it

Prime among these tests is whether the extractor looks for his compensation to the severance and sale of the mineral or whether his compensation is dependent upon the personal covenant of those with whom he has contracted. In the former case his interest is obvious but if there is no sale of the mined mineral or no share thereof in kind [17] he receives no compensation.

Secondary tests include such factors as the amount of control the contractor has over the amount and time of production, the disposal and sale of surplus production, the length of the term of the contract and whether the operator has substantially retained the right to terminate the contract at will. A long term firm contract ordinarily vests a depletable interest in the contractor.

On the other hand, a short term contract terminable at will which bars the contractor from control of production are indications of a hiring [18] and vests no depletable interest.

However these tests are but evidentiary of the decisive question: Has the taxpayer-miner an economic interest or

is the opinion of this office that dependent upon their rights in respect of the properties involved, stripping contracts may be properly regarded as entitled to deduction for depletion in all respects as in the case of other mineral properties. The fact that some of the contracts bear aspects of agency or employment, or that ostensibly the contractor may not acquire legal title to the mineral does not control * * *. "It is not the view of this office, however, that the deduction for depletion is to be granted in every case. On the contrary, it seems clear that the allowance is warranted only where, under the agreement between the parties, the stripping contractor obtains a capital interest in the mineral in place and must look to the severance and sale of the mineral for the return of capital consumed in that process. (See G.C.M. 22730, supra). In this respect, it is noted that in some instances contracts may be cancelled by the coal company at will. Under said circumstances, it would appear that the contractor received no binding right to extract the mineral and thus fails to obtain a capital interest therein. Lacking such an interest in the mineral, it follows that the contractor cannot properly claim a deduction for depletion. "In the opinion of this office, a contract which is terminable by the coal company at will, and which thus fails to vest in the contractor the requisite capital interest in the mineral in place is one in which the coal company has an absolute right to cancel at any time without cause or condition * * *. "One of the contracts examined shows that the coal company reserves the right, without payment of damages, to 'suspend' work indefinitely at any time or from time to time; under another contract the coal company is given the right, upon five days notice to the contractor and without payment of damages, to suspend work for an indefinite period; and under a third contract the coal company may suspend operations during such time or times as the company operates at a loss because of the minimum payable to the contractor. Since contracts of this character, despite the power of indefinite suspension provided for therein, do not, except under specific conditions, appear to permit the coal company to dismiss contractors absolutely and substitute others to extract the minerals, it is the opinion of this office that such contracts should not be classified as contracts which may be cancelled 'at will'.

"It is noted further that in some of the contracts the contractor must look for his compensation solely to the extraction and sale of the coal, that in others his compensation is dependent partly upon extraction and sale of the coal and partly upon removal of the overburden and other factors, and that in still others the remuneration payable to the contractor is in no way dependent upon extraction and sale of the mineral * * *. Where, under the tests hereinabove described, the contract is not terminable at the will of, or upon nominal notice by, the Coal Company, it is the view of this office that if the contractor must look for his compensation solely to the extraction and sale of the mineral, he is entitled to deduction for depletion."

17. Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 68 S.C. 861, 90 L.Ed. 1062; Palmer v. Bender, 1933, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489; Commissioner of Internal Revenue v. Gregory Run Coal Co., 4 Cir., 1954, 212 F.2d 52; Eastern Coal Corp. v. Yoke, D.C.N.D.W.Va., 67 F.Supp. 166, 175.

18. See Commissioner of Internal Revenue v. Mammoth Coal Co., 3 Cir., 229 F.2d 535.

a mere economic advantage by his contract?

The parties here do not dispute the law or the criteria mentioned and this

case was tried by the Tax Court on a stipulation of facts.

We review the applicable decisions in brief in the margin.[19]

19. Thus, in Helvering v. Elbe Oil Land Co., 1938, 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904, taxpayer acquired certain oil leases, prospecting permits and drilling agreements. Development work resulted in the discovery of oil. Taxpayer conveyed away all its right and title for one third of net profits payable monthly. Held: The transaction was a sale with compensation payable in installments. No economic interest remained in the seller.

In Spalding v. United States, 9 Cir., 1938, 97 F.2d 697, taxpayer engaged an oil company to drill and operate oil lands, obtained by her from the State for a period of years. Taxpayer to pay the State a 5% royalty and the oil company an amount equal to 61⅔% of the net proceeds of the total production leaving 35⅓% to her. Held: Taxpayer entitled to a depletion deduction.

In Helvering v. O'Donnell, 1938, 303 U.S. 370, 58 S.Ct. 619, 82 L.Ed. 903, taxpayer sold his one-third stock interest in a petroleum company to another oil company in return for one-third of the net profits from the first company's properties which the buyer agreed to acquire. Held as a mere owner of shares taxpayer did not possess a depletable interest. The agreement to pay taxpayer one-third of the net profits was a personal covenant constituting an economic advantage.

The case of Helvering v. Bankline Oil Co., 1938, 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897, presented a situation where taxpayer contracted with various producers to take title to "wet gas" at the respective wellheads, extract the gasoline from it, and pay the producers either in kind or cash one-third of the total gross proceeds derived from the sale of the gasoline. Held: Taxpayer derived an economic advantage from the production of the wet gas, but no economic interest in it prior to its production at the wellhead.

In Morrisdale Coal Mining Company v. Commissioner, 1952, 19 T.C. 208, wherein taxpayer was engaged in "deep mining" operations on leased properties some of the seams outcropped on mountain slopes and could be mined only by strip mining, an operation taxpayer was not equipped to handle. Taxpayer therefore contracted to have this mined by independent contractors who furnished their own equipment. The contractors were

to mine coal in accord with taxpayer's demands and were to be paid a specified amount per ton delivered to railroad cars. The amount the contractors were to receive was not dependent upon the market nor the price received for the sale of the coal. Payments were made at stated intervals and were independent of whether or when taxpayer sold the coal. The court stated:

"The independent contractors who strip-mined fringe coal for petitioner had no right to receive any coal in kind, to sell any coal to anyone, or to share in the proceeds of the sale of the coal to anyone. The independent contractors who strip-mined fringe coal had no economic interest in such coal."

James Ruston v. Commissioner, 1952, 19 T.C. 284, is a case indicating circumstances under which a strip-mining contractor may be entitled to depletion. The holder of mining rights acquired by lease entered into a contract with a coal strip-mining contractor whereby the latter agreed to strip-mine all strippable coal on the property. The contract gave the stripper the exclusive right to strip-mine the coal and required it to perform certain duties which had been imposed upon the holder of the mining rights by the terms of the leases. The contractor was to receive as compensation 83 per cent of the net selling price of the coal. Held: In light of the contractor's exclusive right to mine the land, the nonterminable nature of the contract (except for lack of vigorous prosecution) and the requirement that the contractor could look solely to the sale of the coal for his remuneration, that the contracts conveyed an economic interest in the coal in place to the stripper.

The Morrisdale case, supra, 19 T.C. 208, was followed in Mammoth Coal Co. v. Commissioner, 1954, 22 T.C. 571. Taxpayer coal corporation contracted with the Caparell Stripping & Construction Co. to strip-mine certain coal lands owned by taxpayer and deliver the coal removed to the taxpayer at a specified price per ton which was stated to be the contractor's sole compensation. Payments were to be made at specified times and were in no way dependent upon the selling price of the coal. The company had the right to suspend operations in its discretion and could cancel the contract entirely if the contractor did not prose-

In the instant case, during the taxable years in question, petitioner operated the Suntrana lands on a year to year basis. The government could in its discretion terminate the contract. Petitioner had no control over the productive output of the mines being limited to the production of a specified amount of coal. Compensation was set at $362,500 for 1947 and $577,000 for 1948, and was payable in strict accordance with the schedule of supplies at a specified amount per ton dependent upon the grade of coal. Title to the coal at all times remained in the United States. The coal came from its lands and was used by it. Petitioner took no title to it and accordingly petitioner's contention that the coal was sold to the Army is untenable. There was no sale and no gross proceeds in which petitioner could share. Petitioner's gain depended, not as is contended by him upon the severance and sale of the coal but upon the covenant of the United States government to pay him a certain sum for services performed. This sum was in no way affected by fluctuation of market price.

It is our opinion from the logic of the circumstances and from a reasonable relation of the instant facts in the applicable decisions including the Tax Court decision here on review, that petitioner by the contract acquired an economic advantage but no economic interest in the coal in place, hence he is not entitled to a depletion allowance.[20]   Affirmed.

---

cute it with sufficient vigor. Taxpayer paid all real estate taxes and provided guard service for the property. Held: Citing the Morrisdale case: The strippers possessed no economic interest in the coal and were not entitled to a depletion deduction.

In Helen C. Brown v. Commissioner, 1954, 22 T.C. 58, taxpayer and her husband were equal partners in a coal company in addition to which each spouse owned one-half of the stock of E. M. Brown, Inc. The partnership granted the corporation the exclusive right to mine certain of its coal properties for one year. The corporation was to receive 75% of the amount realized after deducting royalties, rentals and commissions. Held under the authority of James Ruston, supra, 1952, 19 T.C. 284: E. M. Brown, Inc. obtained an economic interest on which it was entitled to depletion.

In Eastern Coal Corporation v. Yoke, D.C.N.D.W.Va.1946, 67 F.Supp. 166, taxpayer coal corporation leased certain coal lands subject to a 10-cent per ton royalty to the lessor and agreed to buy from the lessor the equipment and improvements of the mine. Simultaneously taxpayer contracted to sell to the Ford Motor Co. 6,000,000 tons of coal at $1.56 per ton. Subsequently the lessor assigned the lease to Ford and a new agreement was made under which taxpayer acquired from Ford a one-eighth undivided interest in all the coal in the leased tract, which taxpayer had the absolute right to extract and market for its own account if mined within 15 years. Taxpayer agreed to sell 5,000,000 tons of coal to Ford from the other 7/8ths interest. Taxpayer was to have exclusive possession and operation of the property, the right to cut timber and the duty to pay local taxes. Taxpayer was to receive only $1.46 per ton, but the 10-cent per ton royalty was dropped. Held: Taxpayer had a depletable interest in its undivided 1/8th portion and in the remaining 7/8ths which it worked for Ford.

And in North Range Mining Co. v. Commissioner, 1942, 46 B.T.A. 296, taxpayer acquired by contract with Ford Motor Co. the right to operate for five years the Blueberry mine of which Ford was sublessee. The contract, which could be cancelled by either party on six months notice, provided that taxpayer was to pay real estate taxes and control production subject only to filling the demands of Ford at $1.25 per gross ton. Taxpayer could dispose of any excess ore to the public at prevailing prices subject only to the payment of a royalty to Ford comparable to the royalty Ford paid its lessor. Adjustments of the contract could be made periodically to the extent of 60% based upon cost of the prevailing labor scale. Held: Since taxpayer could share in the ore produced, it possessed such an economic interest as to be entitled to a deduction.

20. Nor is what we have said in any way in conflict with Commissioner of Internal Revenue v. Gregory Run Coal Co., 4 Cir., 1954, 212 F.2d 52, upon which petitioner relies extensively. In that case, the only other case on this subject as yet decided by a court of appeals, the 4th circuit in reversing the tax court merely decided that under the facts there present, the

strip-mining contractors had gained a depletable interest in the coal produced. It is to be noted that there the strippers were either engagd in a joint venture with the coal company or were entitled to an increase in the amount paid per ton in the event of an increase in selling price. In each case the strippers looked to the sale of the coal for their compensation and were accordingly entitled to the depletion deduction. However, the basis theory is not questioned. The court in Gregory Run relied upon Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 66 S.C. 861, 90 L.Ed. 1062, supra, note 11, and Eastern Coal Corp. v. Yoke, D.C.N.D.W.Va., 67 F.Supp. 166, 175, supra, both of which are in accord with our views, and concluded with the statement, viz.:

"Nor is it always easy to draw the line between transactions which constitute one a purchaser of an economic interest, as distinguished from one who merely performs the labor of production for a fixed sum and thereby becomes merely the hireling of the producer for a specific purpose. We think, however, that in the pending case the rights of the producers were completely dependent upon the extraction of the salable product and that consequently they were entitled to share in the benefits of the statute which were designed to give compensation to persons interested in the production of a wasting asset." [212 F.2d 61.]