MORRISDALE COAL MINING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 27605. Promulgated November 12, 1952.

*George E. H. Goodner, Esq.,* for the petitioner.
*Edwin P. Friedberg, Esq.,* for the respondent.

RICE, *Judge:* The respondent determined deficiencies in excess profits tax for the taxable years 1944 and 1945 in the amounts of $60,498.21 and $47,314.33, respectively, and a deficiency in income tax for the taxable year 1946 in the amount of $4,969.81. Petitioner claims relief from excess profits tax liability for the years 1944 and 1945 under section 721 of the Internal Revenue Code, which relief respondent has denied.

The issues to be decided are: (1) whether petitioner should exclude from "gross income from the property," in computing its percentage depletion deduction amounts paid to independent contractors for strip-mining "fringe" coal; (2) whether petitioner is entitled to deduct from its gross income in 1946 a part of the vacation pay paid its employees in 1947 for the vacation period from June 1, 1946, to May 31, 1947, as having accrued during 1946; (3) the amount of adjustment to be made in petitioner's accrued earnings and profits at the beginning of each of the years here in question arising from the decision of this Court in a case involving petitioner's excess profits tax liability for 1943; and (4) the amount of relief, if any, to which petitioner is entitled under section 721 of the Internal Revenue Code.

In paragraph 4 (c) of the petition, error is alleged on the part of the respondent for failure, in arriving at the excess profits tax liability

Note: *Frederick E. S. Morrison, Esq., J. Hayden Oliver, Esq.,* and *John W. Bodine, Esq.,* filed brief as *amicus curiae.*

for 1944, to give the petitioner the benefit of an unused excess profits credit carry-back from 1946 of not less than $51,301.74; and, in paragraph 4 (d) of the petition, error is also alleged on the part of respondent in failing to carry over to 1945 any unused portion of such carry-back. Petitioner failed to argue this issue in its brief or its reply brief, merely stating that it was not abandoning this issue and would argue it under Rule 50.

In his brief respondent conceded that petitioner was entitled to a net operating loss carry-over from Morrisdale Supply Company for the taxable year 1945 following a merger of that company with petitioner.

## Issue 1.

### FINDINGS OF FACT.

Petitioner is a corporation organized under the laws of Delaware in 1915 with its principal office at Philadelphia, Pennsylvania. It has been engaged in the mining and sale of bituminous coal since 1932. Tax returns for the years here involved were filed with the collector of internal revenue for the first district of Pennsylvania. Petitioner kept its books and records on a calendar year accrual basis. Its excess profits credit was computed on the invested capital method.

During the years 1944, 1945, and 1946, petitioner was engaged in the mining and selling of coal from leased properties. Petitioner's operations were what is termed "deep mining," and it was not equipped to mine the coal to the extreme limit or edge of the coal seams where such seams outcropped on the side of a mountain or slope. Petitioner, therefore, contracted to have this fringe coal, on property which it had under leases, mined by independent contractors who furnished their own equipment. Such practice was customary in mountainous coal mining areas such as that operated by petitioner.[1]

Under the fringe stripping contracts, the independent contractors

---

[1] See G. C. M. 26290, 1950–1 C. B. 42, in which the following appears:

Subsequent to development of the steam shovel and other heavy excavating machinery, it was found that coal which did not lie at too great a depth could be economically mined by removing the overlying earth or strata, usually designated as overburden. The companies which first mined coal by this method operated in those parts of the country, principally the Middle West, in which the surface of the land is comparatively level and the coal lies at a fairly uniform distance beneath the surface. These companies bought their own stripping machinery. In the mountainous coal fields of the East there are few large areas which can be mined by removing the overburden, and the owner or lessee of the property does not ordinarily buy the necessary stripping equipment. Accordingly, in the case of small tracts of coal land from which the mineral cannot be economically removed by underground mining, as well as in situations in which a fringe of coal near the surface cannot be satisfactorily extracted by underground methods, the contractor who owns stripping equipment has solved a problem of the industry [p. 43].

agreed to mine the coal covered by the contract and deliver it to petitioner for a specified price per ton.

In its Federal tax returns for the years in question, petitioner took depletion deductions on coal mined by the independent contractors in the following amounts:

| | |
|---|---|
| 1944 | $5,911.10 |
| 1945 | 16,286.96 |
| 1946 | 15,995.71 |

Such amounts not only reflected depletion on fringe coal mined by independent contractors, but also depletion on deep coal mined for petitioner by independent contractors.

In his statutory notice of deficiency, respondent disallowed the percentage depletion allowances claimed by petitioner as deductions from gross income insofar as they were attributable to amounts paid by petitioner to the independent contractors. At the hearing and subsequent thereto, respondent conceded that petitioner is entitled to a percentage depletion allowance on amounts paid by petitioner for deep coal mined by independent contractors but still determined that amounts paid by petitioner to independent contractors for strip-mining of fringe coal should be excluded from gross income from the property in computing percentage depletion.

Petitioner entered into a contract with Robert Bailey on May 1, 1941, whereby the latter undertook to strip-mine "E" and "D" seams of coal on land of the Maxton Coal Company leased by petitioner from Wigton Coal Company (hereinafter referred to as Wigton) and to place in railroad cars "for the use and benefit of * * * [petitioner] all coal recovered from said seams." Such contract further provided:

It is contemplated that the mining operations will be conducted in the outcrop of said seams of coal as said outcrop occurs in the vicinity of the present Maxton slope, and that the delivery of said coal into railroad cars will be by means of trucks over wagon or truck roads to be built and maintained by Robert Bailey; and that the coal recovered and which the Morrisdale Coal Mining Company agrees to accept in railroad cars shall be of good, merchantable quality, satisfactory to the Morrisdale Coal Mining Company, * * *.

Robert Bailey agrees to prosecute his operations under this contract continuously and with effect so as to load, if required by the Morrisdale Coal Mining Company, not less than 100 tons per day, if coal in the seams is available to produce so much and if the market requirements of Morrisdale Coal Mining Company shall require such quantity of coal. If the market requirements of Morrisdale Coal Mining Company for said coal shall not be sufficient to keep Robert Bailey working at a capacity of 100 tons per day for five days per week, he shall have the right to terminate this contract without liability on account of such termination.

This contract shall continue for a period of two years from the date hereof, unless Robert Bailey suspends operations for a period of ten days or more at any

one time, in which event the Morrisdale Coal Mining Company shall have the right to terminate this agreement; * * *.

The actual site of operations by Robert Bailey under this contract shall at all times be fixed and determined by the Morrisdale Coal Mining Company. Morrisdale Coal Mining Company shall not be liable to Robert Bailey for any inability on its part to market the coal Robert Bailey may, might or could produce from the contemplated area of operations.

In Consideration Whereof, the Morrisdale Coal Mining Company agrees to pay Robert Bailey for each and every net ton of 2000 pounds net weight of coal delivered into railroad cars, as aforesaid, $1.30 per net ton; this rate of compensation shall require Robert Bailey to take an over-burden on said coal up to 22½ feet of thickness; the price or compensation per ton to Robert Bailey for coal recovered from the seam where the over-burden exceeds 22½ feet shall be the subject of negotiation between the parties, * * *.

It is understood and agreed that under and by the terms of this agreement, Robert Bailey is an independent contractor and shall take care of all workmen's compensation, social security and unemployment compensation as may be required by law.

* * * payment shall be made on the Saturday following the last day of the calendar month for all coal delivered between the first and the fifteenth days of the preceding calendar month; and payment for all coal delivered, as aforesaid, between the fifteenth and last days of the preceding calendar month shall be paid on the first Saturday following the fifteenth day of the succeeding month. * * *

By letter dated April 15, 1943, said contract was extended for 2 years and also stated the following:

* * * the Agreement is extended to cover the strip mining operations on any lands owned under lease to this Company upon which the Company may from time to time direct Robert Bailey to carry on mining operations under the terms and conditions set forth in the original Agreement.

On April 14, 1944, petitioner entered into a contract with John Rice under which the latter was to strip-mine coal from the "E" seam on land of the Maxton Coal Company. Terms and conditions of such contract were essentially identical with those of petitioner's contract with Robert Bailey except that compensation was to be at the rate of $2.15 per net ton.

On May 1, 1944, petitioner entered into a contract with Heston Fuel Company (hereinafter referred to as Heston). Pertinent terms of such contract were as follows:

Heston Fuel Company agrees to enter upon and engage at its own cost and expense and liability the work of strip mining and loading into railroad cars at designated points coal for account of Morrisdale Coal Mining Company from lands owned, leased or controlled by Morrisdale Coal Mining Company, situate in Morris Township, Clearfield County, Pennsylvania; and further agrees to perform said work in a workmanlike manner and according to the volume of requirements and direction to be given from time to time by Morrisdale Coal Mining Company.

The Morrisdale Coal Mining Company agrees to pay the Heston Fuel Company for the above work the sum of $2.75 per net ton of coal strip mined and

loaded into railroad cars as aforesaid; payment to be made on or before the twentieth day of the calendar month for all coal mined and loaded during the preceding calendar month.

\* \* \* \* \* \* \*

It is understood and agreed that the points of mining, including the point of loading into railroad cars and the required volume of coal to be mined and loaded shall be wholly at the discretion of the Morrisdale Coal Mining Company.

Petitioner and Wigton entered into an agreement on July 31, 1945, providing in part as follows:

The party of the first part [Wigton Coal Company] agrees by its servants, agents, and subcontractors, to enter upon the German farm in Morris Township, Clearfield County, Pennsylvania, during the ensuing period of two (2) years, and conduct strip mining operations thereon for the recovery of all the strip mineable coal in the several seams of coal underlying said German farm, and load and transport said coal in trucks and dump the same into the coal pocket at Maxton Slope Mine in Morris Township, Clearfield County, Pennsylvania; and the said party of the first part agrees to grade and fill back the spoil and debris of said strip mining operations so that from the high wall of the strip mined area out to natural grade the excavated areas shall be passable and usable by vehicles and farm machinery equipment; all of said work to be conducted continuously and diligently by the party of the first part for the party of the second part and commenced on or before August 15, 1945.

In Consideration Whereof, the party of the second part [petitioner] agrees to and with the party of the first part as follows:

1. To comply as an "operator" with the Pennsylvania "Strip Mine Law" of 1945, by registration and deposit of securities as required by said law, and to make the reports required by said law, but it is understood that the party of the first part shall seed or plant the excavated areas on said land.

2. To pay to the party of the first part for said work the sum of two dollars and seventy-eight ($2.78) cents per net ton of coal strip mined and delivered by it to the party of the second part in the coal pocket at Maxton Slope Mine, aforesaid; said compensation for the work aforesaid shall be payable at said rate per ton of coal recovered on or before the 20th day of the month for all coal recovered and delivered, as aforesaid, during the preceding calendar month.

It is mutually agreed by and between the parties that this agreement may be terminated at any time by either of them; and the coal to be strip mined and delivered by the party of the first part shall at all times be of merchantable quality and shall be loaded and delivered as directed by the party of the second part.

There was no written contract with N. F. Depalma who strip-mined fringe coal for petitioner in 1944, nor for any strip-mining done by Wigton on tracts of land other than the German farm.

Neither Heston nor Wigton did the strip-mining themselves; they, in turn, hired independent contractors to do the actual work.

The following table shows the net tons mined by each of the independent contractors doing strip-mining, property on which strip-mining was performed, and amounts paid:

| Stripper | Identification* | Net tons | Amount paid |
|---|---|---|---|
| **1944:** | | | |
| N. F. Depalma | Wigton-Dorris—D Seam | 101.00 | $234.14 |
| Robt. Bailey | Maxton—E Seam | 9,264.00 | 19,918.57 |
| John Rice | Maxton—E Seam | 21,990.00 | 47,277.19 |
| Heston Fuel Co. | | | |
| Robt. Bailey | Ario Pardee—D Seam | 917.00 | 2,659.01 |
| | Wigton-Dorris—E Seam | 4,211.00 | 11,578.87 |
| John Rice | Ario Pardee—D Seam | 7,138.00 | 20,702.50 |
| Total | | 43,621.00 | $102,370.28 |
| **1945:** | | | |
| Heston Fuel Co. | | | |
| Robt. Bailey | Ario Pardee—David Louck—C Seam | 6,085.15 | $18,559.70 |
| | Dorris—D Seam | 34,687.15 | 104,098.93 |
| | Pardee & Ashman—E Seam | 4,089.40 | 12,473.13 |
| John Rice | Ario Pardee—David Louck—D Seam | 15,662.05 | 45,380.02 |
| Wigton Coal Co. | | | |
| John Rice | Philipsburg Coal & Land Co.—D Seam | 3,949.90 | 11,257.21 |
| | German—D Seam | 30,949.50 | 86,039.60 |
| Heston-Wigton (Joint a/c) | | | |
| Robert Bailey | C. Polacck—E Seam | 5,445.65 | 16,336.95 |
| Total | | 100,868.80 | $294,145.54 |
| **1946:** | | | |
| Heston Fuel Co. | | | |
| Robt. Bailey | Ario Pardee—David Louck—C Seam | 13,162.55 | $40,145.78 |
| | Dorris—E Seam | 1,727.50 | 5,908.02 |
| | Pardee & Ashman—E Seam | 7,780.45 | 30,392.80 |
| | Pardee & Ashman—D Seam | 6,633.85 | 23,016.74 |
| Wigton Coal Co. | | | |
| John Rice | Maxton—E Seam | 846.45 | 2,268.46 |
| | German—E Seam | 42,503.40 | 128,249.80 |
| | German—D Seam | 13,361.55 | 42,244.89 |
| Total | | 86,015.75 | $272,226.49 |

*Designation of tract under lease to petitioner and seam of coal on which coal strip-mined.

In strip-mining it is often necessary to remove the "overburden" in order to get to the outcrop of the seam of coal. The overburden varies from zero to 22½ feet and at times even more. Under Pennsylvania law a certificate costing $100 must be obtained for stripmining, and a bond posted to guarantee the restoration of the surface by replacing the overburden after the coal has been strip-mined. During the taxable years the minimum bond was $2,000, plus $200 per acre for each additional acre over 10 to be strip-mined. Such a bond is forfeited if the surface is not restored. While the actual removal and replacement was done by petitioner's independent stripmining contractors, it was petitioner who posted the bonds required by law and who would have had to pay the penalty had the ground not been restored.

The independent contractors who strip-mined fringe coal for petitioner had no right to receive any coal in kind, to sell any coal to anyone, or to share in the proceeds of the sale of the coal to anyone. The independent contractors who strip-mined fringe coal had no economic interest in such coal.

#### OPINION.

The first issue is whether petitioner must exclude from its gross income, in computing its percentage depletion deduction, amounts paid

to independent contractors for strip-mining fringe coal. If the independent contractors had an economic interest in the coal or the proceeds of its sale, the depletion deduction must be equitably apportioned between the petitioner and these independent contractors. See *Palmer* v. *Bender*, 287 U. S. 551 (1933). Section 23 (m) of the Internal Revenue Code provides for depletion in the case of mines, under rules and regulations prescribed by the Commissioner with the approval of the Secretary. Section 114 (b) of the Code prescribes the basis upon which such depletion is allowed, applicable provisions of which are set forth in the margin.[2]

Treasury Regulations 111, section 20.23 (m)–1, provides that a depletion deduction is allowable to the owner of an economic interest in a mineral deposit and defines an economic interest as follows:

* * * An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the severance and sale of the mineral or timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because, through a contractual relation to the owner, he possesses a mere economic advantage derived from production. * * *

Respondent relies on G. C. M. 26290, 1950–1 C. B. 42, as a statement of the reasons why he has disallowed the deduction to petitioner in the case of the independent contractors strip-mining fringe coal for petitioner. However, a part of such G. C. M. states the following:

It is not the view of this office, however, that the deduction for depletion is to be granted in every case. On the contrary, it seems clear that the allowance is warranted only where, under the agreement between the parties, the stripping contractor obtains a capital interest in the mineral in place and must look to severance and sale of the mineral for the return of capital consumed in that process. * * *. [p. 45.]

A study of the individual contracts involved in the present case is also helpful. During 1945 and 1946, all strip-mining was done by Heston and Wigton. They, in turn, hired other parties to do the

---

[2] SEC. 114. (b) (4) : PERCENTAGE DEPLETION FOR COAL, * * *.—

(A) In General.—The allowance for depletion under section 23 (m) shall be, in the case of coal mines, 5 per centum * * * of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23 (m) be less than it would be if computed without reference to this paragraph.

(B) Definition of Gross Income From Property.—As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining", as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term "ordinary treatment processes", as used herein, shall include the following: (i) in the case of coal—cleaning, breaking, sizing, and loading for shipment; * * *.

actual strip-mining. In 1945 both John Rice and Robert Bailey did strip-mining under the Heston contract, and in 1946 only Robert Bailey did it for that company. John Rice did the strip-mining during 1945 and 1946 under the Wigton contract. For these 2 years, therefore, it is necessary to study the contracts existing with Heston and Wigton.

Petitioner's contract with Heston provided that the sites of mining and the volume to be mined would be wholly at the discretion of petitioner. Under such circumstances it was entirely up to petitioner as to whether and how much coal should be mined under such contract. No economic interest was therefore acquired by Heston under such contract nor by either John Rice or Robert Bailey who actually mined the coal for Heston.

Petitioner's contract with Wigton merely covered strip-mining on the German farm. While the contract was to run for 2 years from July 31, 1945, a provision appeared in said contract whereby either party could terminate the contract at any time. In G. C. M. 26290, *supra*, the following appears:

* * * it is noted that in some instances contracts may be canceled by the coal company at will. Under such circumstances, it would appear that the contractor receives no binding right to extract the mineral and thus fails to obtain a capital interest therein. Lacking such an interest in the mineral, it follows that the [independent stripping] contractor cannot properly claim a deduction for depletion. [p. 45.]

The contract between petitioner and Wigton is expressly covered by this provision of the G. C. M. and the independent contractor (Wigton) under such a contract acquired no economic interest in the coal.

During 1944 strip-mining was done for petitioner by N. F. Depalma, Robert Bailey, John Rice, and Heston, (the latter utilizing Robert Bailey and John Rice). We have already set forth our reasons why the contract with Heston did not give it an economic interest in the coal. Petitioner's contracts with Robert Bailey and John Rice were essentially similar. Robert Bailey's original contract was for a period of 2 years from May 1, 1941, and was renewed by letter dated April 15, 1943, for a 2-year period beginning May 1, 1943. Said letter also extended the original contract to cover strip-mining operations on any land under lease to petitioner. The contract with John Rice was for a period of 2 years from April 14, 1944, and covered strip-mining of the E seam on land of the Maxton Coal Company which was under lease to petitioner. This same property was property which Robert Bailey had contracted to strip-mine under his original agreement with petitioner. Therefore, neither Robert Bailey nor John Rice had the exclusive right to strip-mine that area.

Whether these contracts were sufficient to give either John Rice or Robert Bailey an economic interest as defined by Treasury Regulations

is a question of fact, and each case must be determined in the light of the facts and circumstances present therein. It is unnecessary to go into a discussion of all the factors making up an economic interest since under the contracts present in the case at bar certain requirements set forth in the cases and Treasury Regulations as necessary to constitute an economic interest are not present here.

Most of the cases in which depletion has been allowed to an independent contractor have involved situations where the producer or miner of the mineral or other depletable asset has received payment either in kind or as a percentage of the ultimate selling price or profit derived from the sale of the commodity. *Spalding* v. *United States* (C. A. 9, 1938), 97 F. 2d 697, certiorari denied 305 U. S. 644 (1938); *cf. Edward J. Hudson*, 11 T. C. 1042 (1948), affd. (C. A. 5, 1950) 183 F. 2d 180.

Neither of such situations is present in the instant case. The independent contractors received a stated amount per ton for coal of good merchantable quality satisfactory to petitioner. The amount they were to receive per ton was not dependent upon the market nor upon the price petitioner received upon the sale of such coal. Payment was made at stated intervals provided in the contract and was entirely independent of whether or when petitioner sold the coal. The contractors assumed no risk as to the market price, they received no payment in coal, and they had no right to sell any coal to other parties.

The amount of coal mined by such contractors was entirely dependent upon the demands of petitioner. If it wanted no coal, they could not mine any and sell it to other parties. The only course open to them, if petitioner did not require a minimum stated amount in the contract, was that they could terminate the contract.

Such a situation is entirely different from that existing in cases such as *North Range Mining Co.*, 46 B. T. A. 296 (1942), and *Eastern Coal Corporation* v. *Yoke*, 67 F. Supp. 166 (N. D. W. Va., 1946). In *North Range Mining Co.*, the taxpayer leased certain iron mines and agreed to deliver to Ford Motor Company iron ore in amounts required by Ford at a stated amount per ton. However, the taxpayer had the right to mine as much iron ore as it wished and to sell it to others, agreeing to pay a royalty to Ford for any such iron sold. In considering that case, we held that a division could not be made between any interest acquired in the iron delivered to Ford and that which was mined and sold to the third parties; and since under all the facts an economic interest was acquired in the amounts sold to third parties, it was also applicable to that delivered to Ford. Such case is distinguishable from the instant case. In *Eastern Coal Corporation*, it was held that, looking at substance and not form, during

the taxable years the taxpayer was in no different position under agreements then in effect than it was in the prior year under a former agreement when the Commissioner conceded that Eastern was entitled to percentage depletion. The facts present in that case are far different from those present in the instant case. There under both agreements Eastern paid all taxes assessed on the entire property, payments for coal were to fluctuate according to certain formulae, buildings and personalty were owned by Eastern, and Eastern was granted the right to mine the whole tract for a term of 15 years. The court, looking at all the facts, said:

* * * The language used in the new agreements seems to follow generally the language used in the old agreements, except that the word "grantor" is substituted for "lessor" and "grantee" for "lessee," and Eastern is described as the "contractor." A comparison of the two sets of agreements shows that Eastern as "contractor" or "grantee" had substantially the same duties and was required to operate the mining property in substantially the same manner as when it was designated as "lessee." It is fundamental in tax law that the courts look through form to fact and substance. * * * In substance Eastern continued as a lessee and as such was entitled to percentage depletion. [67 F. Supp. 174.]

A closer case to the instant one is *Oliver Iron Mining Co.*, 10 T. C. 908 (1948). In that case, the owner of mining property entered into an agreement with another whereby the latter "should have the right and obligation to manage and operate the properties by mining, shipping, marketing, and selling such ore as could be profitably produced and marketed, conducting all negotiations, making all decisions, entering into all contracts, and performing every act incidental to the mining operations." All expenses connected with the management and operation of the properties were deducted by the operator from the amount collected from the sale of the ore and the net income, after deduction of such expenses, was turned over to the owner by the operator. The operator received 4 cents per gross ton of ore mined for its services. In that case we held that, since the operator was an agent of the owner, the owner was entitled to compute percentage depletion upon the gross income from the sale of the ore by the operator and not merely on the net amount turned over to it by the operator.

One requirement of the Treasury Regulations is that the party secure "income derived from the severance and sale of the mineral or timber, to which he must look for a return of his capital." Regs. 111, sec. 29.23 (m)–1. While it is true that the manner in which the relationship is created, whether it be by sublease, assignment, contract, etc., is immaterial in such cases in determining whether an economic interest exists, *Palmer* v. *Bender, supra*, we find it difficult to conceive how, in the instant case, a sale of the coal from the inde-

pendent contractor to petitioner could have occurred. If such requirement means the ultimate sale by petitioner after acquiring the coal from the independent contractors, such a situation does not exist in this case. The independent contractors were in no way dependent upon the sale of the coal by petitioner for receipt of their compensation. The contracts provided for payment at specified times entirely unconnected with the sale of such coal by the petitioner; nor did the independent contractors have to look to the sale of such coal for the return of capital.

Another factor to be considered is the statutory requirement appearing in section 114 (b) (4) of the Code which provides that the basis for percentage depletion shall be the gross income from the profit "excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property." We fail to see where under the facts existing in this case the payments by petitioner to the independent contractors could in any way be termed "rents or royalties."

Section 114 (b) (4) (B) defines "gross income from the property" upon which percentage depletion for coal is calculated, as "gross income from mining" and defines "mining" as including not only the extraction of the mineral but also includes such processes as "cleaning, breaking, sizing, and loading for shipment." Respondent's regulations had stated that transportation costs were not includible as a part of the mining process and were to be deducted from gross receipts in order to determine gross income for percentage depletion purposes. See Regulations 111, sec. 23 (m)–1 (f) (4). That Congress intended that amounts paid, even to independent contractors, in the process of obtaining the marketable product should not be excluded from "gross income from mining" is indicated by an amendment of section 114 (b) (4) (B) by section 207 of the Revenue Act of 1950. Such amendment provides that if the ordinary treatment processes are carried on at a distance from the mine of not more than 50 miles in the ordinary case, the term "mining" in section 114 (b) (4) (B) includes "the transportation of ores or minerals (*whether or not by common carrier*) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied." (Emphasis added.)

The only other contracts under which independent contractors strip-mined fringe coal were oral contracts. Into this class would fall the strip-mining done by Wigton on other tracts than the German farm during 1945 and 1946 and by N. F. Depalma during 1944. If the written contracts gave no economic interest it must follow that the oral contracts cannot be deemed to have given the independent contractors an economic interest in the coal which would entitle them to depletion.

Under such circumstances, we conclude that none of the independent contractors acquired a depletable economic interest in the coal, and respondent erred in excluding the amounts paid such independent contractors by petitioner from petitioner's gross income in determining percentage depletion for the years in question. *Cf. Southwest Exploration Co.*, 18 T. C. 961.

*Issue 2.*

### FINDINGS OF FACT.

Petitioner deducted $33,174 in its return for 1946, which amount represented cash payments made by petitioner to its miners and employees for that year as vacation pay. Such payments were made under the union contract with the miners in existence at the beginning of 1946, and there is no controversy over such deduction. Petitioner claims that it is entitled to an additional deduction in the amount of $19,216.65 as "vacation pay" for 1946. Such amount was not deducted in petitioner's income tax return for 1946, nor was it entered upon petitioner's books as an accrued expense for 1946 until 1950. No part of said amount was paid to petitioner's employees during 1946.

By Presidential Executive Order No. 9728 dated May 21, 1946 (11 Fed. Reg. 5593), the bituminous coal mines were seized by the United States and placed under the authority of the Secretary of the Interior acting as Coal Mines Administrator. On May 29, 1946, a contract was entered into between the United Mine Workers of America and the Secretary of the Interior under such executive order. Pertinent portions of such agreement were as follows:

This agreement between the Secretary of the Interior, acting as Coal Mines Administrator under the authority of Executive Order No. 9728 (dated May 21, 1946, 11 F. R. 5593), and the United Mine Workers of America, covers for the period of Government possession the terms and conditions of employment in respect to all mines in Government possession which were as of March 31, 1946, subject to the national bituminous coal wage agreement, dated April 11, 1945.

\* \* \* \* \* \* \*

7. *Vacation Payment*

An annual vacation period shall be the rule of the industry. From Saturday, June 29, 1946, to Monday, July 8, 1946, inclusive, shall be a vacation period during which coal production shall cease. Daymen required to work during this period at coke plants and other necessarily continuous operations or on emergency or repair work shall have vacations of the same duration at other agreed periods.

All employees with a record of one year's standing (June 1, 1945, to May 31, 1946) shall receive as compensation for the above mentioned vacation period the sum of one hundred dollars ($100), with the following exception: Employes who entered the armed services and those who returned from the armed services to their jobs during the qualifying period shall receive the $100 vacation payment.

All the terms and provisions of district agreements relating to vacation pay for

sick and injured employes are carried forward to this agreement and payments are to be made in the sum as provided herein.

Pro rata payments for the months they are on the payroll shall be provided for those mine workers who are given employment during the qualifying period and those who leave their employment.

The vacation payment of the 1946 period shall be made on the last pay day occurring in the month of June of that year.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

On May 16, 1947, the Coal Mines Administrator applied to the Secretary of Labor for approval of a vacation pay plan for the period from June 1, 1946, to May 31, 1947. The application referred to the fact that nearly a year had elapsed since the end of the only qualifying period provided for in the agreement of May 29, 1946, and stated, in part, as follows:

&ast; &ast; &ast; It is therefore proposed that, *in the absence of any agreement* between the private operators of the mines and the Union with respect to vacation payments for 1947, &ast; &ast; &ast;. (12 Fed. Reg. 3869) [Emphasis added].

The Administrator submitted for approval a proposal for vacation pay making the terms and provisions of section 7 of the agreement, set forth above, applicable to a vacation qualifying period of June 1, 1946, to May 31, 1947. Such proposal, after having been approved on May 16, 1947, by a special board acting in lieu of the National Wage Stabilization Board, was approved by the President of the United States on May 17, 1947 (12 Fed. Reg. 3868–3869); and following such approval, on May 28, 1947, the Coal Mines Administrator authorized and directed payments of such vacation pay (12 Fed. Reg. 3625).

OPINION.

The second issue involves the deductibility of vacation pay actually paid by the petitioner to its employees in 1947. Petitioner argues that since it is on the accrual basis, it is entitled to a deduction of $19,216.65 for 1946 which amount represents seven-twelfths of the amount paid by petitioner to its employees in 1947. Petitioner's argument is based on the theory that such amount represented a fixed and definite liability under the terms of the written agreement of May 29, 1946, between the United Mine Workers of America and the Secretary of the Interior. Under the terms of the agreement, all employees of one year's standing from June 1, 1945, to May 31, 1946, would receive, as compensation for such vacation period, $100. Such vacation period was designated by the agreement to be from June 29, 1946, to July 8, 1946, inclusive. The agreement also provided for pro rata payments for any month during which the employee was on the payroll, for those given employment during the qualifying period, and those leaving their employment during such period. Such agreement made no provision for vacations for years following 1946 other than the sentence which read "An annual vacation period shall be the rule

of the industry." Such statement, however, is in and of itself insufficient to create a liability. No provision appeared in such agreement as to the time of a subsequent vacation period, the amount of any vacation pay which might be paid therefor, or whether the same provision would exist for following years as existed for the vacation period of 1946. It was not until May 1947 that section 7 of the agreement was extended to cover the vacation qualifying period of June 1, 1946, through May 31, 1947.

In addition, the agreement of May 29, 1946, provided in its preamble that it was merely an agreement "for the period of Government possession" and was subject to the National Bituminous Agreement dated April 11, 1945. This Court has recently construed the 1945 agreement in *Tennessee Consolidated Coal Co.*, 15 T. C. 424 (1950), on appeal, C. A. 6. We held in that case that one-twelfth of the vacation pay was not accrued by the petitioner therein during each month of the year, stating, in part, as follows:

* * * Liability for payment in the instant case depended on a condition precedent, i. e., whether or not the miners, individually, were working for the company on the date required in the contract and had complied with the requirements contained therein. "The accruability test of a debt is not certainty of payment, but rather certainty of its liability * * *." *TransCalifornia Oil Co., Ltd.*, 37 B. T. A. 119, 127. The petitioner's liability for the vacation payments here in question did not become certain until the arrival of the date specified in the contracts. Before such a date the petitioner did not have the facts necessary to calculate its liability whereby it could accrue a specified portion of its vacation payments each month. There might be strikes or changes in amount of vacation payments. The petitioner has not shown that there was not possibility or probability thereof. We conclude that the petitioner is not entitled to the additional deductions claimed in its petition for accrued vacation payments. [p. 431.]

The petitioner itself never treated the vacation pay involved herein as an accrued expense for 1946 until some time in 1950. Under all the circumstances involved herein, the $19,216.65 was not a fixed and definite liability of petitioner during the year 1946 and was not deductible by petitioner in 1946. Under such circumstances, it is unnecessary for us to consider respondent's alternative contention that even if such payment were deductible in 1946, the amount paid by petitioner during 1947 to employees who were not union members was not deductible since the agreement of May 29, 1946, was not applicable to such persons.

*Issue 3.*

FINDINGS OF FACT.

The statutory notice of deficiency in the instant case dated January 12, 1950, computed petitioner's accumulated earnings and profits as at January 1, 1944, on the basis of petitioner's 1943 income and excess

profits tax liabilities appearing in the statutory notice of rejection of claim for relief under section 721 of the Code in *Morrisdale Coal Mining Co.*, 13 T. C. 448 (1949) (hereinafter referred to as the prior case), involving petitioner's income and excess profits tax liabilities for the year 1943. Such liabilities had been determined by respondent in the notice of rejection regarding 1943, as $2,629.19 and $93,621.86, respectively, subject to postwar refund credit of 10 per cent of the latter amount, $9,362.19. On September 14, 1950, we entered a decision in the prior case determining an overpayment in excess profits tax for 1943 in the amount of $22,415.84. Such amount represented the difference between the total payments in excess profits taxes, $85,138.07, and a net excess profits tax liability (after postwar refund credit) of $62,722.23. The postwar refund credit of $5,337.63 consisted of a credit of $2,768.75 against the excess profits tax on income attributable to 1943 and a credit of $2,568.88 against the excess profits tax on income attributable to 1942. On February 9, 1951, respondent issued a statutory notice of deficiency which determined a deficiency in income tax of $10,549.34 against petitioner for the year 1943 based upon a total income tax liability of $17,186.62. Such deficiency arose because of the decrease in petitioner's excess profits tax liability for 1943 as found by this Court.

Respondent's computations of petitioner's accumulated earnings and profits as at January 1, 1944, 1945, and 1946 based upon the adjustments resulting by reason of this Court's decision in the prior case are as follows:

|  | | | 1/1/44 | 1/1/45 |
|---|---|---|---|---|
| Accumulated earnings and profits per statutory notice | | | *$92,329.45 | *$203,041.78 |
| *Less:* | | | | |
| Elimination of Post War Credit | $9,362.19 | | | |
| Allowance of Post War Credit | 5,337.63 | | 4,024.56 | 4,024.56 |
| | | | $88,304.89 | $199,017.22 |
| *Add:* | | | | |
| Elimination of tax Liabilities— | | | | |
| Income Tax | $2,629.19 | | | |
| Excess Profits | 93,621.86 | 96,251.05 | | |
| Accrual of redetermined tax liabilities— | | | | |
| Income Tax | 17,186.62 | | | |
| Excess Profits | 68,059.86 | 85,246.48 | | |
| Net Adjustment to Accumulated Earnings and Profits | | 11,004.57 | | 11,004.57 |
| Corrected Accumulated Earnings and Profits | | 99,309.46 | | 210,021.79 |

*Reflects inclusion of Post War Credit year 1943 as an asset in the amount of $9,362.19 and accrual of Federal Income and Excess Profits Tax Liabilities in the amounts of $2,629.19 and $93,621.86 respectively.

| | | |
|---|---:|---:|
| Accumulated Earnings and Profits per Statutory Notice | $92,329.45 | $203,041.78 |
| Adjustment necessary to correct petitioner's accumulated earnings as of January 1, 1944, and January 1, 1945 | $6,980.01 | $6,980.01 |

| | 1/1/46 |
|---|---:|
| Accumulated earnings and profits as at January 1, 1945 as set forth in notice of deficiency dated January 12, 1950 | $203,041.78 |
| Add: | |
| Adjustment to give effect to Tax Court's order pursuant to the petitioner's Rule 50 Computation | 6,980.01 |
| Revised accumulated earnings and profits as at January 1, 1945 | $210,021.79 |
| Add: | 1/1/46 |
| Net income for year 1945 per statutory notice | $124,373.40 |
| Excess of percentage depletion over cost depletion | 45,655.93 |
| Capital gain offset by capital loss carry-over from prior years | 8,976.19 |
| Credit to surplus by reason of merger with Morrisdale Supply Co. | 14,657.50 |
| | $403,684.81 |

| | | |
|---|---:|---:|
| Deduct: | | |
| Income tax liability—1945, per statutory notice | $18,899.66 | |
| Excess profits tax liability—1945, per statutory notice | 65,020.98 | 83,920.64 |
| Accumulated earnings and profits as at January 1, 1946 | | $319,764.17 |

By reason of the adjustments resulting from our opinion in the prior case, petitioner is entitled to a net increase in the amount of $6,980.01 in its accumulated earnings and profits at the beginning of each of the taxable years 1944, 1945, and 1946 (prior to any adjustments resulting from our determination of the instant case).

OPINION.

The parties are in agreement that petitioner is entitled to an adjustment in its accumulated earnings and profits as at the beginning of each of the years here in question as a result of the decision of this Court in the prior case. The sole question concerns the amount of such adjustment. Petitioner maintains that it is entitled to increase its earnings and profits for each of the years by the amount which this Court determined that it had overpaid its excess profits tax for 1943, namely $22,415.84. Respondent maintains that the increase in accumulated earnings and profits should be $6,980.01. This latter figure represents the $22,415.84 less certain offsetting adjustments in petitioner's income tax liability and postwar refund credit for 1942 and 1943 which arose from our determination of the overpayment in excess

profits tax for that year. Following our decision in the prior case, respondent issued a statutory notice of deficiency on February 9, 1951, determining a deficiency in income tax against petitioner for 1943. Such determination was made under section 3807 of the Internal Revenue Code and resulted from a reduction of the income tax credit allowable under section 26 (e) of the Code [3] because of the decrease in petitioner's excess profits tax liability for 1943. The other item which respondent contends should reduce the amount available to petitioner in increasing its accumulated earnings and profits is the postwar refund credit under section 780 of the Code.[4] Since it is based upon the amount of excess profits tax liability, this postwar refund credit would also be reduced as a result of the decrease in excess profits tax liability for 1943. Such amount was taken into consideration in the Rule 50 computation submitted in the prior case.. Respondent, in the statutory notice of deficiency in the present case, used the postwar refund credit originally allowed in the statutory notice of rejection in the prior case in arriving at petitioner's accumulated earnings and profits for January 1, 1944. Such amount must necessarily be adjusted due to our determination in the prior case, subsequent to the issuance of the deficiency notice in this case.

Petitioner does not contest the computations submitted by respondent in the instant issue but does contest respondent's theory of determining petitioner's accumulated earnings and profits as at January 1, 1944, 1945, and 1946, because of our determination in the prior case. We feel that respondent's approach in the instant issue is the correct one. Petitioner's accumulated earnings and profits as at January 1, 1944, were not increased by the total amount which we found to be the excess profits tax overpayment for 1943. Rather, that amount must be reduced by the increased income tax liability and by the reduced

---

[3] SEC. 26. CREDITS OF CORPORATIONS.

In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

    *        *        *        *        *        *

(e) INCOME SUBJECT TO EXCESS-PROFITS TAX.—In the case of any corporation subject to the tax imposed by Subchapter E of Chapter 2, an amount equal to its adjusted excess-profits net income (as defined in section 710 (b)). In the case of any corporation computing such tax under section 721 (relating to abnormalities in income in the taxable period), section 726 (relating to corporations completing contracts under the Merchant Marine Act of 1936), section 731 (relating to corporations engaged in mining strategic minerals), or section 736 (b) (relating to corporations with income from long-term contracts), the credit shall be the amount of which the tax imposed by such subchapter is 90 per centum. * * * [Sec. 202 (c) of the Revenue Act of 1943 substituted "95 per centum" for "90 per centum" in the second sentence effective for taxable years beginning after December 31, 1943.]

[4] SEC. 780. POST-WAR REFUND OF EXCESS PROFITS TAX.

(a) IN GENERAL—The Secretary of the Treasury is authorized and directed to establish a credit to the account of each taxpayer subject to the tax imposed under this subchapter, for each taxable year ending after December 31, 1941 (except in the case of a taxable year beginning in 1941 and ending before July 1, 1942), and not beginning after December 31, 1943, of an amount equal to 10 per centum of the tax imposed under this subchapter for each such taxable year. * * *.

postwar refund credit resulting from lower excess profits tax liability. We, therefore, hold that petitioner's accumulated earnings and profits were increased as at January 1, 1944, 1945, and 1946 by the amount of $6,980.01 (prior to any adjustments resulting from our determination of the instant case).

## *Issue 4.*

### FINDINGS OF FACT.

During the taxable years in question, petitioner sold bituminous coal mined from the Maxton Slope "B" seam. This mine had been in the development stage from 1940 through September 30, 1942. Total development costs up to that date were $50,201.64, allocable as follows:

| Year | Amount |
| --- | --- |
| 1940 | $17,251.39 |
| 1941 | 16,612.98 |
| 1942 | 16,337.27 |
| Total | $50,201.64 |

During 1944 petitioner sold 253,240 net tons of coal from the Maxton Slope "B" seam, and during 1945 it sold 273,673 net tons. Its abnormal income for 1944 was $173,442.17, and for 1945 was $72,957.80. The portion of direct costs allocable to abnormal income was $72,036.02 for 1944, and $33,244.33 for 1945.

The following table sets forth the average sales price per ton of coal mined from the Maxton Slope "B" seam and the average cost of production from said mine for the years 1942 through 1945:

| Year | Sales Price | Cost of Production |
| --- | --- | --- |
| 1942 | $2.5615 | $1.8620 |
| 1943 | 3.0216 | 2.2576 |
| 1944 | 3.3680 | 2.4714 |
| 1945 | 3.5254 | 2.8037 |

The net abnormal income of 1944 was due to higher prices to the extent of 16.48 cents per ton. No part of the net abnormal income of 1945 was due to higher prices.

### OPINION.

Neither party briefed the issue as to whether petitioner was entitled to relief under section 721[5] of the Code for 1944 or 1945. We have,

[5] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum

therefore, been forced to determine the controversies existing between the parties in regard to this issue from the opening statements of counsel at the hearing, discussions which counsel had regarding section 721 relief at the hearing, testimony given at the hearing, and a comparison of the claims submitted by petitioner and by respondent at the hearing. Many of the arguments raised by respondent are identical with those which he raised in the prior case. Such arguments were presented by respondent at that time in his brief and again in a motion for modification of the findings of fact and reconsideration of the opinion and conclusions of law or, in the alternative, a request for a supplemental hearing or rehearing filed in the prior case involving section 721 relief for 1943. Said motion was denied after both sides had presented oral arguments. Insofar as said arguments raised by respondent involve conclusions of law or findings of fact determined in the prior case, the doctrine of collateral estoppel is applicable. *Commissioner* v. *Sunnen*, 333 U. S. 591 (1948). See also Griswold, Res Judicata in Federal Tax Cases, 46 Yale L. J. 1320 (1937) ; and Note, Collateral Estoppel by Judgment, 52 Col. L. R. 647 (1952). The only questions which are left for our consideration are the method of calculating the factor to be used to determine what portion, if any, of net abnormal income for each of the taxable years before us is due to higher prices during that taxable year, and the effect of section 735 (b) (4) of the Code.

Petitioner maintains that in order to calculate for 1944 the factor to determine the portion of net abnormal income due to improved business conditions, the average net income per ton of coal sold during 1943 and the average cost of production per ton during 1943 should be compared with similar figures for 1944; and that the 1945 figures should be compared with those of 1944. Respondent maintains that the increase due to higher prices should be obtained by a comparison of the 1942 figures with the figures of the years in question, his theory being that such figures are those of the last year of development. We feel that neither approach is correct. Section 721 of the Code provides, in part, that in order to determine the abnormal income a comparison be made with 125 per cent of the average amount of the gross income for the four prior years to the year in question. Section 721 (b) provides that the amount of net abnormal income attributable to prior years shall be determined under regulations prescribed by

of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income :

\* \* \* \* \* \* \*

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or‑processes, or any combination of the foregoing, extending over a period of more than 12 months. \* \* \*.

the Commissioner with the approval of the Secretary. Regulations 112, section 35.721–3, requires that in determining net abnormal income an adjustment be made for higher prices during the year in question since income resulting from such higher prices could in no way be attributable to the development period. Neither the Code nor the regulations spell out what figures are to be used to determine such higher prices. We feel that to determine what amount, if any, of the abnormal income during the year in question is due to higher prices, costs and sales prices for prior years must be averaged and compared with the year in issue. See *Rochester Button Co.*, 7 T. C. 529, 553 (1946); and *Southwestern Oil & Gas Co.*, 6 T. C. 1124 (1946). In the instant case, the first year in which such figures are obtainable is 1942, because prior to that time petitioner was undergoing development of the Maxton Slope "B" seam. Therefore, to determine the factor for 1944, an average for 1942 and 1943 must be compared with the 1944 figures.

The average sales price for 1942 and 1943 per net ton of coal sold from the Maxton Slope "B" seam was $2.7916 and the sales price for 1944 was $3.3680, or a difference of $0.5764. The average cost of production for 1942 and 1943 was $2.0598 and the cost of production for 1944 was $2.4714, or a difference of $0.4116. The net abnormal income of 1944 therefore was due to higher prices to the extent of 16.48 cents per ton which, when multiplied by the 253,240 tons sold in 1944 shows that $41,733.95 was due to higher prices in 1944 and must be subtracted from the abnormal income of 1944 to find what portion thereof is attributable to prior years.

For 1945, the average figures for 1942, 1943, and 1944 must be compared with those of 1945. The average sales price per net ton of coal from the Maxton Slope "B" seam for 1942 through 1944 was $2.9837 and for 1945 was $3.5254, or an increase of $0.5417. The average cost of production for the years 1942 through 1944 was $2.1970 and for 1945 was $2.8037, or an increase of $0.6067. Since the cost of production increased more than the sales price during 1945, none of the abnormal income for 1945 was attributable to higher prices, and all of it is attributable to prior years.

The only other question left for us to consider in determining the amount, if any, of section 721 relief available to petitioner for these years is what effect, if any, section 735 (b) (4)[6] has on the computation.

---

[6] SEC. 735. NONTAXABLE INCOME FROM CERTAIN MINING * * * OPERATIONS * * *.

(b) NONTAXABLE INCOME FROM EXEMPT EXCESS OUTPUT.—

* * * * * * *

(4) COAL AND IRON MINES AND TIMBER PROPERTIES NOT IN OPERATION DURING BASE PERIOD.—For any taxable year, the nontaxable income from exempt excess output of a coal mining * * * property * * *, which was not in operation during

Such section provides that, in the case of a coal mine not in operation in the base period, one-sixth of the net income from the property during the taxable year should be exempt from excess profits tax. The effective date of such section was for any taxable year beginning after December 31, 1941. Respondent argues that the net abnormal income for any year must be reduced by an amount equal to the excess profits net income exempt under section 735 (b) (4).

Section 735 (b) (4) relates only to the computation of the tax, and the amount of exempt income is one-sixth of the net income of that year. In a situation, such as here, where income during a particular year is allocable to other taxable years, an adjustment under section 735 (b) (4) with respect to the exempt income is necessary. Under such circumstances, the net abnormal income attributable to prior years should be added to the net income of the coal mining property for such prior years for purposes of the section 735 (b) (4) computation and, for the same purposes, the same amount should be subtracted from the net income of such property for the taxable year to which section 721 applies.

We conclude this opinion by pointing out what should be obvious. When counsel fail to do the initial research and brief the issues presented to the Court, to put it mildly, an undesirable situation arises. It is unfair to the Court, it is unfair to counsels' clients, and it is unfair to the thousands of other taxpayers waiting to have their cases heard. If the Court is required to do the initial research (the burden of which rests on counsel) as well as its own independent research in cases as involved as this one, an impossible situation will arise.[7]

Reviewed by the Special Division as to the section 721 issue.

*Decision will be entered under Rule 50.*

---

the base period, shall be an amount equal to one-sixth of the net income for such taxable year (computed with the allowance for depletion) from the coal mining * * * property * * *.

[7] This paragraph is not intended to apply to counsel who filed a brief as *amicus curiae.*