B. H. Swaney & Sons, Inc. v. Commissioner. Swaney Contracting Company v. Commissioner.
B. H. Swaney & Sons, Inc. v. Commissioner
Docket Nos. 38221, 38222.
United States Tax Court
1953 Tax Ct. Memo LEXIS 40; 12 T.C.M. (CCH) 1371; T.C.M. (RIA) 53384; December 4, 1953
*40 During their respective fiscal years, petitioners, pursuant to contracts with the lessee of certain coal properties, strip mined such coal and hauled it to the lessee's tipple. Held, on the facts, petitioners acquired no depletable interest in the coal in place by assignment or otherwise. A. M. Cantrall, Esq., Post Office Box 352, Clarksburg, W. Va., and W. G. Stathers, Esq., for the petitioners. George C. Lea, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income taxes of petitioners for years and in amounts, as follows: Petitioner
Fiscal Year Ended
Deficiency
B. H. Swaney & Sons, Inc.
September 30, 1947
$5,516.03
Swaney Contracting Company
July 31, 1947
9,649.36
The sole issue in controversy is whether the petitioner in each proceeding is entitled to a deduction for percentage depletion computed for its taxable year on its gross income received for strip mining and hauling coal pursuant to its agreement with the holder of the leases covering the premises from which such coal was extracted. Findings of Fact Portions of the facts which have been stipulated *41 by the parties are accordingly so found and made a part hereof. Petitioner in Docket No. 38221 is B. H. Swaney & Sons, Inc. (hereinafter called Swaney & Sons), a corporation organized under the laws of the State of West Virginia on October 1, 1945. The petitioner in Docket No. 38222, Swaney Contracting Company (hereinafter called Contracting Company), is also a West Virginia corporation, which was organized on August 9, 1944. Both petitioners maintain their principal offices at Clarksburg, West Virginia. Each filed its income return for its respective fiscal year with the collector of internal revenue for the district of West Virginia at Parkersburg. Commercial Coal & Coke Company (hereinafter called Commercial), the owner of certain coal areas in Harrison County, West Virginia, by various agreements, leases and supplemental leases dated on and prior to October 29, 1945, leased such coal to Dawson Coal Company (hereinafter called Dawson) for mining purposes. Such agreements and instruments of lease were in full force and effect throughout the fiscal periods here involved. By a lease dated October 29, 1945, Dawson, with consent of Commercial, leased to one J. E. Vincent, a portion *42 of such coal, situated on Lambert's Run in Eagle District of Harrison County, West Virginia, for strip mining purposes. Such instrument of lease was in full force and effect throughout the fiscal periods here involved. This lease imposed upon Vincent as lessee the duty of securing the necessary mining and stripping rights and privileges therefor from the owners of the land overlying such coal. In complying with such provisions, Vincent individually entered into various leases which granted such surface rights. Vincent's lease with Dawson also required him to mine the coal in accordance with the most approved and suitable methods of modern strip mining so as to obtain the maximum amount of coal; to comply with all laws and regulations regarding the working of strip mines and the backfilling and regrading to be done after the coal is removed; to protect and remove pipe and other lines; to mine and remove all of the coal that could be reasonably and practicably mined by strip mining; to observe statutory restrictions and protect adjoining properties; to furnish maps; to give bond and secure State strip mining permits; to provide roads; to begin loading coal not later than January 16, 1946, and *43 thereafter to pursue his mining operations with diligence and dispatch; to furnish sufficient machinery, equipment and employees to produce 25,000 tons of coal a month; to comply forthwith with all directions and demands given or made by the State Department of Mines; to protect the coal faces from water and to prevent the drainage of water into the deep mine workings; to give a $2,500 performance bond; and to indemnify Dawson against claims, etc., arising out of his operations. Vincent complied with these and other portions of the lease by obligating the petitioners, each as to the area assigned to it, to comply therewith in accordance with paragraph 21 thereof, which provided, as follows: "Assignment or sublease 21. The Lessee may, without releasing himself, assign this lease, at any time within 60 days from the date hereof, to a corporation to be organized and controlled by him, which corporation shall expressly assume all the obligations hereof, a copy of such assignment to be furnished to the Lessor by the Lessee. No other assignment of the lease is to be made without the written consent of the Lessor and of Commercial Coal & Coke Co.; but Lessee may, without releasing himself, *44 and subject to all of the terms and provisions of this lease, sublet or subcontract the stripping operations on not to exceed 50% of the coal crop exposure covered by this lease, any such sublease or subcontract to be submitted to Lessor for its examination and approval before the same goes into effect. Lessee shall be and remain responsible to Lessor for the performance of all obligations of, and for the full compliance with the provisions of this lease by, any such subleasee or subcontractor." By agreement dated December 24, 1945, the Contracting Company agreed with Vincent that it would strip mine a certain part of such coal and deliver the coal so mined to Vincent's tipple. Such agreement was in full force and effect from its date until after the end of the Contracting Company's fiscal year ended July 31, 1947. The strip mining of coal thereunder was the only operation engaged in by the Contracting Company during such fiscal year and it complied in all respects with the terms and conditions thereof. Under the agreement between Vincent and the Contracting Company, Vincent was to secure the strip mining leases and surface rights; to provide a suitable sidetrack and tipple; to *45 have complete charge of the tipple; to furnish and pay the men required for the operation of the tipple and sidetrack; and to have complete charge of the coal after it was loaded or dumped at the tipple. The Contracting Company was to conduct strip mining operations with diligence and dispatch; it was in all respects to "* * * operate as an independent operator in conducting its operations * * *" thereunder; and it was to furnish adequate machinery and equipment and sufficient employees to mine and haul 25,000 tons of coal a month, the production of which coal was to be continuous and uniform as practicable and reasonably possible. In conducting its mining operations and in backfilling and restoration, the Contracting Company was to be bound by and in all respects comply with the terms of the leases under which Vincent was the lessee. It was to furnish to Vincent a performance bond in the penal sum of $2,500; to save Vincent harmless from the acts or omissions in conducting its operations; to carry adequate public liability and property damage insurance; and to mine and remove 200,000 tons of coal a year as required by Vincent's lease from Dawson. The payment provisions of the agreement *46 between Vincent and the Contracting Company were stated to be based on the current zone market price of $2.88 a net ton and Vincent agreed to pay the Contracting Company for all merchantable coal mined on the premises and hauled to and dumped at Vincent's tipple at the rate of $2 a ton, with any price increase over $2.88 a ton to be shared one-fourth by Vincent and three-fourths by the Contracting Company, and with any price reduction, down to $2.76 a ton, to be shared 88/288ths by Vincent and 200/288ths by the Contracting Company. Provisions were made to minimize the loss to any party in the event the market price was reduced below $2.76 a ton, it being stated that it was the intention that Vincent should not be obligated to suffer an actual loss but that the Contracting Company should have the right to salvage what it could. Paragraphs 13 and 14 of the agreement between Vincent and the Contracting Company provided, as follows: "13. The party of the second part shall be paid on the same basis that the party of the first part receives payment from Weaver Coal Company, that is for all coal accepted and paid for by said company, but no deductions shall be made from the price payable *47 to said second party hereunder for coal accepted at the tipple or in the pit by Dawson Coal Company. In case said Weaver Coal Company, or such other sales agent as may hereafter have charge of the sale of said coal, shall fail to pay said first party for any coal so loaded and shipped, such default shall not, in any case, relieve said first party from his obligation to pay said second party the price provided by this agreement and on the basis and at the times herein provided. "14. Neither party hereto shall have the right to cancel this agreement except for default on the part of either party, as hereinbefore set forth, or because of reduction in the sale price of coal below $2.76 a net ton and failure to re-negotiate this contract, as provided in paragraph 11 hereof." Under the contract, Vincent was responsible for the payment of royalties for the coal and surface rights under his leases. The contract provided for arbitration of disputed matters. In mining and producing coal under its agreement with Vincent and in hauling such coal to the tipple, the Contracting Company used machinery and equipment with a net depreciated value of $86,063.63 on August 1, 1946, and of $101,604.87 *48 on July 31, 1947, the beginning and the end of its fiscal year here involved. The total investment of the Contracting Company in the mining of the coal was $156,998.03 on August 1, 1946, and $229,773.12 on July 31, 1947, these sums being its total assets on the dates stated. During its fiscal year ended July 31, 1947, in the construction of roads over which to reach the coal and to haul it out to Vincent's tipple on the railroad, the Contracting Company spent $14,921.48 in disbursements for material and labor, not including equipment costs or rental for its own equipment. Its agreement with Vincent required the Contracting Company to comply with the State laws relating to the strip mining of coal, and, as so required, the Contracting Company made two applications, filed maps, gave bonds in the sums of $14,000 and $4,500 respectively, and was granted stripping permits Nos. 1077 and 1257, and, having complied with all the requirements thereof, under date of January 18, 1952, the Chief of the Department of Mines of the State of West Virginia and the Director of the Agricultural Experiment Station of West Virginia University released the Contracting Company and the sureties on its bonds *49 and certified that they had fully complied with the provisions of the law. The cost of backfilling was $1,500 per acre. The Contracting Company mined its first coal under its agreement with Vincent during the month of March, 1946. For March and April, 1946, it received $2 a ton based on the then current OPA zone market price of $2.88 a ton for mine run coal. For May, 1946, through June, 1947, it received $2 plus 22.5 cents (3/4ths of 30 cents increase in zone price) or $2.225 a ton. On August 22, 1946, Vincent wrote the Contracting Company that he would have to pay the 5 cents Union Welfare and Retirement Fund assessment, and, begining with June, 1946, and through May, 1947, 3/4ths of this 5 cents was by agreement borne by the Contracting Company, reducing its share of the price to $2,1875 a ton. On July 10, 1947, Vincent wrote the Contracting Company that it was believed that "we" would not be required to pay the 5 cents assessment and tendered an amount of $8,275.99. The Contracting Company did not accept on the ground that the amount was insufficient and on August 26, 1947, Vincent returned the whole sum that had been withheld, $9,761.11. This payment restored the share of the *50 Contracting Company to $2.225 a ton on the coal produced from June, 1946, through May, 1947. For June, 1947, the Contracting Company received the same amount of $2.225 a ton. The net sales price increased to $3.68 and for July, 1947, through February, 1948, the Contracting Company received $2.60 a ton. During its fiscal year ended July 31, 1947, the Contracting Company mined 232,042.87 tons of coal for which it received monthly payments totaling $507,862.10, the rates per ton varying with the actual sales prices of the coal produced by it, which rates ranged from a low of $2.1875 a net ton to a high of $2.60 a net ton. The net income of the Contracting Company from the property, computed without allowance for depletion, was $132,600.32 during such fiscal year. During such fiscal year, the Contracting Company did not pay or incur in respect of such property any rents or royalties which should be excluded from its gross income for the purpose of computing percentage depletion, if allowable. On its tax return for its fiscal year here in question, the Contracting Company claimed an allowance of $25,393.06 as percentage depletion. In the statutory notice herein, the respondent disallowed *51 the entire amount of the percentage depletion claimed by the Contracting Company for such fiscal period. By agreement dated April 26, 1947, Swaney & Sons agreed with Vincent that it would strip mine a certain part of the coal leased to him by Dawson under the instruments described above and deliver the coal so mined to Vincent's tipple. Such agreement was in full force and effect from its date until after the end of the fiscal year of Swaney & Sons, which is here involved. The strip mining of coal under the agreement was the only operation engaged in by Swaney & Sons during its fiscal year ended September 30, 1947, and it complied therewith in all respects except the giving of a performance bond which was waived by Vincent. The provisions of the agreement between Vincent and Swaney & Sons were generally the same as those of the agreement between Vincent and the Contracting Company, except that Swaney & Sons agreed to provide adequate machinery and equipment and sufficient employees to enable the production of coal by both petitioners to be maintained at a level of 25,000 tons a month. The payment provisions of the Vincent-Swaney & Sons agreement called for Swaney & Sons to receive *52 $2.18 plus one-half of the excess over $3.25 of the net sales price of the coal, less brokerage, averages over 6 months' periods, with any reduction, down to a point where the operation is unprofitable to Vincent (allowing 25 cents a ton for depreciation of tipple and sidetracks) to be shared 100/318ths by Vincent and 218/318ths by Swaney & Sons. Provisions were made to minimize the loss to each party in the event the sales price was reduced below such unprofitable point, it being stated that it was the intention that Vincent should not be obligated to suffer an actual loss, but that Swaney & Sons should have the right to salvage what it could. The agreement further provided, in part: "* * * In case of default by said first party in making any payment hereunder to said second party and such default continues for five days after such payment is due, said second party may, at its option, cancel this contract but said first party shall not thereby be relieved from his obligation to make payment at the rate above specified for all coal theretofore strip mined and loaded by said second party. * * *
"12. The party of the second part shall be paid on the same basis that the party *53 of the first part receives payment from Weaver Coal Company, that is, for all coal accepted and paid for by said company, but no deductions shall be made from the price payable to said second party hereunder for coal accepted at the tipple or in the pit by Dawson Coal Company. In case said Weaver Coal Company, or such other sales agent as may hereafter have charge of the sale of said coal, shall fail to pay said first party for any coal so loaded and shipped, such default shall not, in any case relieve said first party from his obligation to pay said second party the price provided by this agreement and on the basis and at the times herein provided." In mining and producing coal under its agreement with Vincent and in hauling such coal to the tipple, Swaney & Sons used machinery and equipment with a net depreciated value of $73,359.38 on September 30, 1947, the end of its fiscal year here involved. The total investment of Swaney & Sons in the mining of such coal was $310,756.69 on September 30, 1947, this sum being its total assets on that date. Its agreement with Vincent required Swaney & Sons to comply with the State laws relating to the strip mining of coal, and, as so required, *54 Swaney & Sons made application, filed a map, gave bond in the sum of $11,500, and was granted stripping permit No. 1671, and, having complied with all the requirements thereof, under date of February 15, 1952, the Chief of the Department of Mines of the State of West Virginia and the Director of the Agricultural Experiment Station of West Virginia University released Swaney & Sons and the surety on its bond and certified that it had fully complied with the provisions of such law. Swaney & Sons mined its first coal under its agreement with Vincent on April 23, 1947. For April through July, 1947, it received $2.18 a ton. On September 2, 1947, it received $5,842.90 as one-half the excess over $3.25 of monthly net average sales prices up to August 1, 1947. During its fiscal year ended September 30, 1947, Swaney & Sons mined and produced 120,258.79 tons of coal, for which it received monthly payments totaling $290,317.09 at rates per ton varying with the actual sales prices of the coal produced by it, such rates per ton ranging from a low of $2.18 to a high of $2.858. The net income of Swaney & Sons from the property, computed without allowance for depletion for such fiscal year, totaled *55 $97,274.61. During its fiscal year, Swaney & Sons did not pay or incur in respect of such property any rents or royalties which should be excluded from its gross income for the purpose of computing percentage depletion, if allowable. On its tax return for such fiscal year, Swaney & Sons claimed an allowance of $14,515.85 as percentage depletion. In the statutory notice, the respondent disallowed the entire amount of the percentage depletion claimed by Swaney & Sons for such fiscal period. Vincent handled the selling of all coal which was strip mined by the petitioners. By agreement dated October 29, 1945, Vincent made arrangements with J. H. Weaver Company for the sale of all of the strip coal which might be produced from the areas here involved. Such agreement remained in force until September 1, 1947, when it was terminated. Beginning in or about July of 1947, Vincent began to sell some of this coal without the aid of Weaver as selling agent, and after September 1, 1947, throughout the remainder of the period here in question, Vincent sold all of his coal in that manner. Payments by Vincent to petitioners for coal so sold were generally computed and paid according to the same formula *56 and in the same manner as such payments were computed and paid while the Weaver contract was in force. At all times during the taxable periods here in question, the coal tipples to which petitioners delivered the coal were either owned or controlled by Vincent, who also handled the marketing of the coal which was strip mined by petitioners. In each instance, Vincent specified to petitioners the amount of coal which was to be strip mined and delivered to his tipple each day. He arranged with the railroad company for the shipping of the coal to the customers, and when the coal was loaded over the tipple into the railroad cars on siding, it was enroute thereto. Coal was produced and hauled by petitioners, and processed over the tipple and shipped by Vincent, only on specific orders from consumers and in the sizes and quantities directed in those orders. At all times petitioner had adequate supplies of coal uncovered and ready for production and hauling to the tipple, to meet the orders received by Vincent from consumers to the extent of the available railroad cars. Opinion VAN FOSSAN, Judge: The sole question for our determination is whether the petitioner in each case at any time *57 during its respective fiscal period here involved acquired an economic or depletable interest in the coal in dispute so as to entitle it to a percentage depletion allowance in accordance with sections 23 (m) and 114 (b) (4) (B) of the Internal Revenue Code. [1]
*58 The parties have stipulated that the Vincent referred to above in our findings of fact is one and the same person as the petitioner in J. E. Vincent, et al., 19 T.C. 501; that petitioners herein are the same as to which reference was made in the findings of fact and opinion in such case; and that the contracts by and between Vincent and the petitioners herein are the same ones passed on there. Thus, we have heretofore considered the question here presented, i.e., whether Vincent through his contracts with petitioners, transferred to them an economic interest in the coal. In holding there that such an interest did not pass to petitioners herein, we said that: "* * * In Vincent's contracts with the Swaney companies, there were provisions for reduction or increase of the basic price per ton to be paid to the strippers if the current zone market of the price of coal was reduced below or increased above specified amounts per ton. They also contained a provision for cancelation by Vincent if the market price was reduced below a stated figure and if the parties failed to renegotiate the contracts. None of these provisions gave the stripping contractors an economic interest *59 in the coal in place. The sliding price merely provided for adjustment of the price per ton to be paid to the strippers upon the coal that they mined and hauled. The Swaney companies were not dependent on the sale of coal by Vincent for their compensation, as both contracts provided that the failure of the sales agent to pay Vincent should not relieve Vincent of his obligation to pay the Swaneys the price agreed upon at the times and on the basis provided in the agreements. The contracts here were more like those involved in the Morrisdale Coal Co. case, * * *, than those in James Ruston, * * *." Petitioners take the position that our ruling in the Vincent case is not binding here as to them inasmuch as they were not parties thereto, and that when all the evidence bearing upon the question is made available, as here, such evidence clearly points to the fact that petitioners' contracts with Vincent, as modified and construed by the parties, did give them an economic interest in the coal in place. True, there is no place here for application of the doctrine of res judicata, but, after a thorough reconsideration of the question in light of all of the evidence appearing on this record, *60 we remain unconvinced of any error in the ruling there made that no economic interest in the coal passed to petitioners during their respective fiscal years before us. James Ruston, 19 T.C. 284, cited and relied upon by petitioners, is not, in our opinion, controlling here. It was also relied on in the Vincent case but was there held to be distinguishable. In their attempt to show that the factual situation here is parallel to and on all fours with that in the Ruston case, petitioners have introduced evidence bearing upon the distinguishing features between that case and the Vincent case, as pointed up in the Vincent opinion. Such evidence, however, falls short of establishing that the Ruston case is indistinguishable from the present cases. On the record here made, we conclude and hold that petitioners did not, during their respective fiscal periods here under review, possess an economic interest in the coal in place, and that they are not entitled to the depletion allowances sought. See Morrisdale Coal Mining Co., 19 T.C. 208. Accordingly, respondent's determination is sustained. Decisions will be entered for the respondent. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. * * *
(m) Depletion. - In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * * SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION. * * *
(b) Basis for Depletion. - * * *
(4) Percentage Depletion for Coal, Bauxite, Fluorspar, Flake Graphite, Vermiculite, Beryl, Feldspar, Mica, Talc (including Pyrophyllite), Lepidolite, Spodumene, Barite, Ball, Sagger, and China Clay, Rock Asphalt, Phosphate Rock, Trona, Bentonite, Gilsonite, Thenardite, and Metal Mines, Potash, and Sulfur. - * * *
(B) Definition of Gross Income from Property. - As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining", as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term "ordinary treatment processes", as used herein, shall include the following: (i) In the case of coal - cleaning, breaking, sizing, and loading for shipment; * * *↩